FILED

AUG 1 2 2020

TIMOTHY M. O'BRIEN CLERK
By_____Deputy

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS**

| | |
|---|---|
| Quinn Ngiendo | ) |
| **Plaintiff** | ) Case No. 20-2393- HLT - JJ J |
| v. | ) |
| University Partners, LLC. | ) Civil Division |
| Cardinal Group Investment, Inc | ) |
| Peak Campus Management, LLC | ) |
| Asset Campus USA, LLC | ) |
| **Defendants** | ) |

1. <u>Introduction:</u> - Plaintiff domiciles in the State of Kansas addresses 4301 W 31st Street, Unit 712A, Lawrence, Kansas, Zip Code 66047

2. University Partners is a Delaware Corporation with resident's agent for service as "The Corporation Trust Company", 1209 Orange Street, Wilmington, New Castle, DE 19801

3. Cardinal Group Investments, LLC is founded in the State of Delaware with agent for service is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

4. Peak Campus Management, LLC is a State of Delaware Domestic Corporation with resident agents as Capitol Services, Inc., 1675 S State St. Suite B, Dover, DE 19901

5. Asset Campus USA, LLC is founded in the State of Delaware, with Agent for service as Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

6. This Court has jurisdiction in that parties are total foreigners as to diversity citizenship. This Court has additional jurisdiction on Plaintiff's State claims arising from same acts

7. September 22, 2017 Plaintiff entered into a lease agreement with defendant University Partners to rent a place to stay at "The Connection" addresses 3100 Ousdhal Road, Unit 624, Lawrence, Kansas, Zip Code 66047

8. University Partners took over ownership of this property around April 2019 from a previous Real Estate Agency acting for owner or was a principal landlord Asset Campus

9. Defendant University Partners, is a Real Estate Company who owns and runs "The Connection at Lawrence" addresses 3100 Ousdhal Road, Lawrence, Kansas, 66047

10. Plaintiff had an incident with this property from day one when she rented, that defendant misrepresented facts as to cleanliness and habitability of subject property.

11. Prior renting, Plaintiff, had made a verbal request for housing accommodation that she suffers rhinitis as a disability and cannot be around mold or trigger dusts

12. Rhinitis is a condition that is triggered by the environmental degradation and other allergens like mold.

13. She was misled shown a luxurious model unit within the property's leasing offices only to be directed into a gross filthy unit with black mold and massive dust clinging out of the unit's central air ventilation system (The A/C).

14. She was frustrated with subject General Manager whom misrepresented these facts then former Assistant General Manager M/s. Kasey Miller.

15. Because she asserted and gave a harsh feedback on this fraudulent misrepresentation that had her perform laborious cleaning, she was subjected to worker repeat harassment.

16. Also intimidation and physical threats to personal safety on a period that was going into two years of her lease contracts and renewals.

17. While away, her unit would be accessed without her permission harassingly, belongings displaced degradingly, her showers used for unknown activities believed dog grooming.

18. Her purse would be emptied off money she came with home while she stepped out of unit to retrieve mail or while deeply distracted fixing meals in the kitchen or involved with a hobby of watching movies.

2

19. An empty unit close to Plaintiff's room, would be used for these types of activities, employee would slip into and out of her bedroom from adjacent unoccupied bedroom unit.

20. This would happen while preoccupied or out of apartment and get into her purse and take away money totaling $678 on different occasions.

21. She would then address these retaliatory behaviors asserting her position property misrepresented habitability and condition of unit that she was not allowed to see told with occupants whom would become roommates but unit clean and ready to go!.

22. Just having moved in, the failures to accommodate rhinitis disability in housing infested with black mold everywhere, were addressed with a Mr. Stephen then principal real estate for owner or landlord the Asset Living, LLC whom coerced Plaintiff to just move back out.

23. Plaintiff having just moved into housing with another disability of a chronic back pain from a 2011 injury, decides to settle down but does not move out coercively already in excruciating pains from a previous move out.

24. Harassments incidents to move out coercively continued with employee becoming more aggressive, rude, threatening, violent and playing games not involved with incidents, steadily in her two year period of dwelling on property.

25. M/s. Kasey Miller would then became the General Manager claiming with full authority to make decisions regarding property, upon transitioning of ownership to Defendant University Partners.

26. She is believed the one involved with several of these harassment incidents which she denied them, incidents included illegal entry to property's unit up until she even attempted locking me out.

3

27. One April 2019, I came back home late and found my bedroom "D" door lock jammed half-way. Again property addresses of incident, is "The Connection" 3100 Ousdhal Road, Unit 624D, Lawrence, KS 66047. "624D" - 624 is the unit and marker "D" is the bedroom.

28. Bedroom units this dwelling, are marked A, B, C, D, and is a four bedroom unit shared amongst four roommates. Bedrooms B and C all in opposite hallways, were unoccupied.

29. So when attempting to force the key into the half jammed door lock keyhole, and being around past 10.45 pm and finally opening it, I strained and tore my right-hand shoulder.

30. It caused a tremendous amount of injury and extreme pain to these dates and a physical disability known as a "frozen shoulder" condition that providers have stated will take 3 years to heal only having done 1 years and 4 months as of this action with physical therapy.

31. After these injury, treatment started promptly and was told this is a major injury that I did not quite understand at the time, but was in severe major excruciating pains.

32. So came July 2019, defendant asserts that my lease has expired and must move out July 31, 2019 promptly, I seek to renew lease with this physical impairment and was denied housing asked to leave.

33. I frantically cry to the management to be considerate that this was not by my own fault making, but theirs and that am a right hand dominant shoulder and could not pack belongings.

34. I also tells defendant, I needed my belongings to be intact where they are so that I can have easy access reach to them as to this disability reasons I sort the lease renewal, but defendant made housing unavailable.

35. At all times of incident leading up to an eviction action in State Court for hold-over, defendant admits liability of subject lock incident as its premises liability.

4

36. M/s. Kasey Miller denies me disability accommodation taking me round and University Partners three principals and executives briefed on the matter, files for eviction hold-over.

37. They also demand past due rents which I counterclaimed with medical bills and drops charges but coercively demands "frozen shoulder" injury trial proceed in the housing court.

38. At all times of this limited action proceeding, defendant admitted liability of plaintiff's adhesive capsulitis "frozen shoulder" and was enthusiastically wanting to settle it for less in $7,000 in medical bills incurred at the time.

39. Court dismisses for lack of Jurisdiction as to limited action landlord-tenant issues. But defendant's lawyer jump in front of plaintiff demanding that we just settle there and then asking me exactly how much I wanted, after court closed on the case and dismissed parties.

40. Plaintiff made it clear that there would be major treatment as per providers, and premature settlement at the time would not be in her favor as she does not know extent of injury yet.

41. At the eviction hearing around August 2019, in the State Court in the matter of University Partners v. Quinn Ngiendo, Case No. 2019-LM-1998, defendants' principals at all times ordered eviction and Plaintiff's physical impairment housing request became known to them.

42. M/s. Kasey Miller the property General Manager at all times, reports to her Director of Operations M/s. Casey Schuller, who is one of the Corporate's principal executive.

43. M/s. Schuller who is defendant's Director of operations at all times, consults and confers with the three Principals namely M/s. Troy Mason, Travis Roberts and Carlie Cresse.

44. At all times of the eviction action, defendant hired lawyers to represent it in court clearly stated appearing on behalf of Corporate-client University Partners and M/s. Kasey Miller principal in-charge property management.

5

45. It is for the first time I would discover that M/s. Kasey Miller was actually assigned with full authority to make decisions on behalf of the Corporation.

46. She also ordered the lawyer-court-room drama blocking my way to demand settlement and seek how much money I wanted for frozen shoulder and authority to drop any rents owed.

47. At all times of eviction, hired lawyers were briefed on matters that Plaintiff sort physical impairment housing accommodation that defendant had turned down or denied housing.

48. Defendant sort eviction of her and were instruction provided by defendants' all three principals in agreement with matter and instruction to proceed with such eviction.

49. Going back to when Plaintiff just moved into defendant's property in the late September 2017. In the following months of October 2017, Plaintiff noticed a very bizarre behavior.

50. An aggressive stomping, jumping and someone dropping very heavy objects onto her bedroom's unit roof from top floors suggesting dumbbells.

51. This was extremely intrusive excessive noise that caused great human psychological suffering being that she has noise sensitivity disability of posttraumatic stress disorder.

52. She calls landlord and inform them to no action with incident getting out of control. Incident started right after Plaintiff was coerced by Principal landlord to move back out.

53. A Mr. Stephen Mitchell, Vice President of Assert Campus Housing, coerced Plaintiff to move out if she could not put up with a moldy unit she sort disability accommodation for.

54. Plaintiff spent very little time in the kitchen and ate from outside having heavily infested with black mold on the walls and on the rooftop ventilation area to avoid inhalation.

55. Being that she had a pre-existing chronic back pains, in December 2017 she resorts to perform a laborious cleaning, spends non-reimbursed a lot of money on professional mold removal supplies as defendants repeatedly stated they don't perform cleaning!.

56. She wears Personal Protective Equipment and gear to remove mold and settles down versus hauling heavy belongings back and forth with a weak injured spine.

57. Her spine, was managed only with limited injection procedure with no coverage and was told would only last 1 year but was now doing over 2 years with it and a very fragile back.

58. It was a painful slow process that took nearly a month of her entire December and eating included cleaning on her Christmas day that she wanted to get rid of the mold fast,

59. Pre-existing roommate with the mold, never helped and took off for entire month that was an advantage to perform this cleaning.

60. Plaintiff suffered a spinal injury back in 2011 from a slip and fall on an icy snowy condition landing on her bottom that left her with a disability spinal injury as of the time of renting.

61. But because Plaintiff never moved as coerced for giving a harsh feedback as to habitability and a failures to accommodate mold sensitivity, employee hired harassment.

62. There would en-mass gang stomping, or suspected massive dumb-bells dropped on top of Plaintiff's roof, or sometimes an aggressive jumping and running around in its excessive.

63. Dumbbells would be dropped on top of her roof that would shake the upper walls and the roof. It would make someone have no choice but to eject was the ultimate goal.

64. Dwelling was to be made more cumbersome, unbearable and difficult but to pack belongings and leave, was the constant and repeat incidents I would encounter.

65. Police were then called several times onto the property and with Plaintiff pleading with management to very kindly investigate and remove noise that she suffered so severely.

66. Plaintiff stated she suffers noise sensitivity disability and seeking repeatedly housing accommodation in vain up until she was forced out of housing 7/31/2019.

67. So finally, plaintiff was evicted on allegations of holdover with defendant refusing to adjust its policies to accommodate her shoulder physical impairment it caused her.

68. It went to court to demand immediate possession of property that the State Court granted it with the statutory laws even making it clear its eviction judgement, is no bar to future action occurring from related transaction that defendant was well aware of.

69. At all times, defendants knew Plaintiff had those rights to bring an action arising from the same occurrences regardless of a judgement but proceeded to evict Plaintiff from housing.

70. It intentionally refused to accommodate her adhesive capsulitis impairment disabilities that it caused her through intentional acts of constructive eviction harassment by employee.

71. Plaintiff in suffering severe frozen shoulder's pain that had started showing its chronicity and impairments, asks Court to accommodate more time to find church members to help.

72. Court accommodates Plaintiff's injury and gives her more time to move out on September 09, 2019 that she had requested and she asks Church members whom agrees to help.

73. Plaintiff given the nature of her physical impairment with the subject adhesive capsulitis, was then enduring another hurdle, stuck with heavy packed belongings to dates cant access.

74. Plaintiff's adhesive capsulitis has left her disabled that she cannot access from previous move-out packed food; utensils; clothing; beddings, bath towels and personal cares.

75. She cannot access essentialities of major activities of daily living with this disability/physical impairment now 1 years and two months.

76. Plaintiff's adhesive capsulitis is a physical impairment or disability she is regarded has having such and with a record that defendant Kasey Miller had denied accommodation.

77. That such physical impairment or disability interferes with one or more major activities of daily living and is regarded to have such record of disability that defendant denied housing.

78. That her adhesive capsulitis alone interferes with making use of her right hand dominant shoulder muscles and skeletal to pack and unpack belongings then hauling them around.

79. That this condition interfered with one or two major life activities of daily living like cooking, hygiene, dressing, making a bed, laundry, cleaning and ranges of motion.

80. That she had asked Defendants to reconsider their position-making to accommodate this disability of adhesive capsulitis physical impairment and renew lease which they refused.

81. At all times of physical impairment, M/s. Kasey Miller the subject General Manager, knew about this impairment that she was provided a record she mocked in front of her workers.

82. Plaintiff still desperate hanging onto housing, was hiked 1 month and half rents for so called "hold-over" that defendant filed eviction to remove her from housing and demanded hiked rents as well.

83. As to the bedroom 624D door lock incident, Plaintiff asserts defendant caused her intentional infliction of emotional distress (IIED) harassing her to constructively evict her from housing.

84. And/or in the alternative caused negligence infliction of emotion distress (NEID) failures to conduct regular inspection to make sure the locks were in condition not to cause injury.

85. These asserted conducts of IIED and/or NEID were plaintiff proximate cause of her person injury of the adhesive capsulitis ("frozen shoulder").

86. That Plaintiff a right hand dominance, was left with limited ranges of motion, daily and continuous pain needing help performing activities of daily living including resuming her favorite recreational activities like fly fishing.

87. Defendant's rude, gruff, impolite and arrogant property's general manager M/s. Kasey Miller and an assistant also intently delayed maintenance as part of constructive eviction.

88. That such delay caused Plaintiff continual pain endurances and distress access to her bedroom unit and each time forcing it open that plaintiff tired had to change locks.

89. Subject Unit addresses 3100 Ousdhal Road, Unit 624, Lawrence, Kansas, Zip Code 66047 which is a 4 bedroom dwelling unit comprises of roommate living situation.

90. Each bedroom unit is assigned a lease with a common shared areas of the kitchen and living room and with bathrooms/showers only installed inside each individual bedroom Units..

91. At all times of incident, subject unit have restrooms/showers or toilets built inside the bedrooms without any other manner or means of using the toilets elsewhere in the Unit but inside the individual leased units.

92. Subject constructive eviction at all times, was as a result of giving this management a harsh feedback on how it fraudulently misrepresented its Units as luxury and clean that Plaintiff depended on such representation to accommodate her disability of rhinitis mold sensitivity.

93. That they had black mold and filthy in critical parts of the unit including the air vents including the kitchen areas and walls making it a health hazard to a rhinitis mold sensitivity.

94. Subject constructive eviction at all times, was as a result of giving this management a harsh feedback on how it fraudulently misrepresented its properties as luxury that they failed to accommodate Plaintiff's disability of rhinitis sensitivity to mold.

95. That they misrepresented facts by showing a clean and luxurious model unit in its leasing offices but failed to inspect habitability of units before leasing or renting them fraudulently.

96. Defendant's conduct wanton, demands possession of property as to an alleged hold-over, that the housing court granted them, it then follows plaintiff to her newer places of abode.

97. I'm complaining that Defendant University Partners, made sure employee followed Plaintiff to her new abode addresses 4301 W 24th Place, Lawrence, Kansas, 66047 to apply for a job.

98. That was an intent to interfere with her housing in furtherance escalation of discriminatory retaliation for seeking housing accommodation with several disabilities.

99. That these disabilities were rhinitis sensitivity to mold, chronic back pains that she could not move back out dissatisfied with a moldy unit and finally with an adhesive capsulitis she sort lease renewal for.

100.   Defendant's employee Mr. Kris Pokrandt is believed was a party to several incidents at The Connection property of intentional engaging or/and abetting excessive noise stomping, running and dropping of heavy objects on top of Plaintiff's roof as part of a constructive eviction harassment retaliation protesting a moldy unit she sort housing for.

101.   "Rockland West" is a property I currently dwell addresses 4301 W 24th Place, Lawrence, Kansas, 66047 where I'm also experiencing similar excessive noise stomping, running and dropping of heavy objects including skate boards with several Police Reports.

102.   Defendant's employee Mr. Kris Pokrandt even had a girlfriend living in "building 6" addresses at "The Connection" property addresses 3100 Ousdhal Road, Lawrence, Kansas, Zip Code 66047 where I dwelled subject of this action.

103.   This same employee is also the one whom took my lease application for housing and processed it whom showed me a very luxurious model unit inside the leasing office.

104.   This employee was a leasing agent with "The Connection" owned and operated by Defendant University Partners prior to its acquisition and worked hand in hand with M/s. Kacey Miller, subject property General Manager.

11

105.    That shortly after plaintiff moved into the Rockland West property, addresses 4301 W 24th Place, Unit 712, Lawrence, KS 66047, Mr. Kris Pokrandt's car was spotted on the close vicinity where Plaintiff lived.

106.    He was also seen on the second floor's front doorways of the apartment complex where same excessive noise has occurred addresses 4301 W 24th Place, Unit 722, Lawrence, KS 66047.

107.    Plaintiff suffers posttraumatic stress disorder sensitivity to excessive noise that aggravates her symptoms, causes her to startle and suffers severely objects heavy in magnitude are dropped on top of her roof or grossly stomped, ran and jumped on.

108.    At all times of "The connection" noise sensitivity accommodation request by Plaintiff placed with defendant, Mr. Kris Pokrandt and Kacey Miller were aware of plaintiff's disability of noise sensitivity.

109.    That at all times of Mr. Kris Pokrandt association with the occupants at the Rockland West that caused similar noises, he was aware this issue was a major conflict with its employer defendant failures to remove such noise and accommodate a disability.

110.    That at all times, defendant Mr. Kris Pokrandt was working under supervision, advice, directives of M/s. Kacey Miller subject property's general manager.

111.    And acted in concert to stalk Plaintiff in her new housing to interfere and retaliate on Plaintiff for prior requests of various disabilities accommodation while staying at the Connection properties they managed.

112.    That at all times of the retaliation and interference incidents, M/s. Kasey Miller was promoted at work by defendant's executives and moved her to its Corporate Office in Dallas, Texas where she is currently a senior employee there.

12

113.    That defendant Kacey Miller at all times of incidents, is a party to the excessive

noise of stomping, running, jumping and dropping of heavy objects onto plaintiff's roof in

both property dwelling scenarios.

114.    And a constructive eviction of plaintiff interference with housing in retaliation for

seeking housing accommodation with various disabilities as narrated herein.

115.    That defendant's aiding hiring of worker Mr. Kris Pokrandt at plaintiff's newer

abode was to interfere with her housing in escalation retaliation constructive eviction.

116.    That the acts of stomping, running and dropping of heavy magnitude objects on top

of Plaintiff's abode's roof in excessive noise was a design constructive eviction harassment

in retaliation for seeking accommodation in housing with various disabilities stated herein.

117.    Kacey Miller at all times of incident had intent to retaliate and interfere with

plaintiff's housing for seeking housing accommodation with four disabilities.

118.    Four disabilities was mainly her chronic back pains; noise sensitivity posttraumatic

stress disorder, rhinitis sensitivity to mold and her adhesive capsulitis dominant shoulder.

119.    That retaliation and interference with housing in both properties scenarios was for

seeking housing accommodation at "The Connection" property in Lawrence, Kansas with

several of these disabilities.

120.    That Plaintiff suffers chronic back pains and could not move right back out when

she discovered mold inside unit at "The Connection" when she moved in, misrepresented.

121.    That Plaintiff is sensitive to certain noises including gross stomping, running on her

rooftop and dropping of heavy objects in magnitude that shook walls and roofs.

122.    That Plaintiff suffers posttraumatic stress disorder sensitivity to certain noises

including stomping, running on her rooftop and dropping of heavy objects in magnitude.

123.    That this is the excessive noise sensitivity disability she sort housing accommodation for that defendant intently failed or delayed to remove but also party to.

124.    That Plaintiff suffers rhinitis sensitivity to mold that needed accommodated in housing prior moving to "The Connection" property that was retaliated by stomping and heavy objects magnitude on top of her roof in constructive eviction harassment to move back out for giving harsh feed of housing misrepresentation and failures to accommodate.

125.    That Plaintiff suffers adhesive capsulitis "frozen shoulder" impairment to right dominant hand that she sort lease renewal at "The Connection" that she was denied.

126.    That she also sort this accommodation of impairment lease renewal to access belongings with ease left intact where they were, and not packaged moved out.

127.    That retaliation and interference with housing in both scenarios, was for seeking housing accommodation prior renting at "The Connection" property as to sensitivity to mold due to a rhinitis disability.

128.    At all times giving rise to some of these incidents described, Cardinal Group, Inc. provided material assistance to defendant University Partners in its acts of retaliation and interference with housing by hiring Mr. Kris Pokrandt from The Connection.

129.    That it was even brought to its attention of one of the executives, M/s. Melissa Carter, Corporate Assistant Portfolio Manager, and did nothing to collect further information but insisted that I should work with this employee on all "my so called noise sensitivity excessive noises concerns".

130.    That Plaintiff acting stupid and under instruction, went to defendant Kris Pokrandt seeking remove such excessive noise and did nothing but condition getting out of control prompting several Police calls reports and aggressive repeat harassment by neighbor.

131.     That M/s. Kasey Miller at all times of these escalations, defendant University Partners knew or should have known that this employee was not retainable or otherwise should have not been hired.

132.     That M/s. Kasey Miller the subject property manager where incidents giving rise to these claims happened, was even given an upper hand in all issues to resolve as it pertains to subject property.

133.     That M/s. Kasey Miller had very little experience as it pertains to property management and had only worked on a trainee level of less than a year, and with nothing but a communications college degree not relevant to property management nor business administration.

134.     That I Plaintiff even personally sort a meeting with M/s. Casey Schuller the Director of Operations of defendant University Partners to discuss M/s. Kasey Miller in vain when she travelled from "Corporate Texas" to supervise "Corporate transition".

135.     The subject "Corporate transition" was when Defendant University Partners, LLC was taking over "The Connection" property and moving in as an investment from prior landlord.

136.     That defendant M/s. Schuller lined-up with all the three Principals as one of the Corporate's executive in its portfolio made plaintiff a mockery analyzing her from head to toe in her demeanor if she was worth her time.

137.     That she declined to further talk about my concerns as to housing accommodation with a PTSD excessive noise sensitivity caused by neighbors, nor remove such harassment in housing.

138.     Plaintiff is of another national origin from Kenya and is also a black race that played a role in such discrimination and not worth anyone's time.

139.     That M/s. Schuller stated M/s. Kasey Miler the property manager had discretion to handle all issues as it relates to tenancy on this property in question and at the time would not discuss further any matters with me.

140.     That Defendant University Partners and Kasey Miller, have a long history of discrimination animus or enmity towards persons with disabilities and impairments.

141.     Defendant University Partners has also chosen to intentionally block handicap access sidewalks leading to and from the property from the bus stop with its student bus.

142.     Its student bus, is neither equipped with handicap access offering transportation to able-body persons without physical disabilities in its escalation of discrimination practices.

143.     And that at one time when I sort the bus and some "student welcome table" blocking handicap access to and from the bus-stop be reassigned, was challenged to a fight by staff

144.     That Kasey Miller subject defendant's general manager came too close physically charging towards Plaintiff for asking that pattern of discrimination be removed its housing

145.     That apart from the table and repeat bus incident, defendant has also repeatedly sprayed with water sprinklers other handicap and Plaintiff with a limping dragging leg.

146.     Plaintiff suffering from an edema limping, was repeatedly sprayed with lawn maintenance water sprinklers while accessing defendant's property's sidewalk.

147.     Sort sprinklers be kindly programmed certain times e.g. at night to accommodate handicap access of sidewalks into the property's housing and was physically threatened.

148.      That Defendant's Kasey Miller became offended by my "so called" several handicap accesses requests and physically charged towards me ordering out of lease-office.

149.    And that Plaintiff being that she at one time had this physical limping impairment, had to struggle with the brushes to access the rest of the handicap sidewalk area to bus stop.

150.    When Plaintiff respectfully sort the so called "student welcome" table relocated so that she did not go behind it through the brushes accessing the bus stop, worker refused.

151.    At all times worker was under supervision of Kasey Miller the subject property general manager whom too continually blocked such access with a student mega bus and did nothing to rectify situation.

152.    That defendant University Partners has clearly demonstrated a pattern of behavior and preferences choice in housing discriminating persons with disability or impairments.

153.    Defendants University Partners and Cardinal Group Investment have nicknamed their dwellings "student housing" but also allowed non student housing

154.    That defendants practices of renting to students predominately is a precursor to preferences in housing including an enmity of persons with disabilities and impairments

155.    That such activities predominately makes defendants rarely deal with persons with disabilities or other impairments in housing but an active able-bodied people.

156.    Reasons Defendant University Partners blocks handicap access to and from bus stop with its mega student bus neither equipped with such access but serves able-bodies.

157.    Defendant University Partners were reckless in disregard of Plaintiff's injury by its way of Premises liability causing adhesive capsulitis making unavailable housing and/or failures to accommodate such disability or physical impairment.

158.    That it intently caused her a physical impairment and refused to renew her lease when she sort accommodation in housing with this disability that will take three years.

159.     That adhesive capsulitis has three stages known as "frozen" "freezing" "thawing" all that takes three years as of time of injury impairments that Plaintiff has only done one and half years now as of this action.

160.     That its conduct was wanton disregard of Plaintiff needing her lease renewed to accommodate a physical impairment of adhesive capsulitis it caused her.

161.     That Defendant University Partner's lock incident intentional constructive eviction lockout harassment of Plaintiff was proximate cause of the adhesive capsulitis impairment.

162.     That defendant University Partner lock incident negligent failures to regularly inspect for such faulty locks, was proximate cause of the adhesive capsulitis impairment.

163.     That such physical impairment of adhesive capsulitis with a housing made unavailable to renew her lease, was also plaintiff's proximate cause of dangerous levels of protein deficiency malnutrition.

164.     That she could not have access to her packed food pantry with such impairment being a right hand dominant affected with the adhesive capsulitis-shoulder.

165.     That the condition of physical impairment of adhesive capsulitis as a personal injury in its self, caused a right hand dominant plaintiff a yearlong and four months disability that she could not fix balanced meals for nutrition that she suffered low albumen discovered as dangerously low protein- malnutrition per labs and diagnoses.

166.     That Defendant University Partner's prior admittance of liability of subject faulty lock its premises liability finds it liable for plaintiff's adhesive capsulitis personal injury.

167.     That such premises liability lock incident, was proximate cause of Plaintiff's adhesive capsulitis physical impairment and now a disability yearlong and a half as of action.

18

168.     Plaintiff repeat, defendant University Partners conduct was wanton disregard of plaintiff's impairment of adhesive capsulitis it caused her, to make housing available by way of lease renewal to accommodate such impairment by being flexible with its policies and practices in place.

169.     An impairment/physical disability it caused and not by way of plaintiff's fault that they were well aware of such physical impairment that they even wanted to settle it out of a State Court with limited Jurisdiction but coerced plaintiff vacate housing by way of an eviction action that she was holding over.

170.     That this conduct was wanton disregard of fair housing accommodation after causing plaintiff physical impairment of adhesive capsulitis it even admitted to record with court.

171.     That Defendant University Partners conduct of pursuing Plaintiff to her new place of dwelling with a suspected violent former employee Chris Pokrandt was wanton motive.

172.     And a wanton intent to interfere with housing as a retaliation for seeking housing be made available to accommodate a disability/impairment of adhesive capsulitis it caused.

173.     That at all times of retaliation and interference with housing, Mr. Chris Pokrandt, was constantly in contact with M/s. Kasey Miller and knew her whereabouts and promotion

174.     That he knew she moved to defendant's corporate offices on a promotion that he shared such information with Plaintiff investigating why similar incidents had followed her to her new place of abode.

175.     That defendant University Partners has engaged in a series of repeat pattern of behavior to retaliate and interfere with Plaintiff's housing follow her to new place of abode.

19

176.    And was as a punishment for her seeking housing be made available to renew lease to accommodate an adhesive capsulitis defendant University Partners caused not her fault

177.    That Mr. Chris Pokrandt, even offered other information that he still dwells at the Defendant's property at "The Connection" at the time of applying for a job at Rockland West where interference with housing and retaliation has occurred as pled this action.

178.    That defendant University Partners made sure it influenced the decision of hiring process at Cardinal Group Investment to suit it hire its suspected violent ex-employee Mr. Chris Pokrandt amongst several applicants to intimidate and interfere with housing in retaliation her new abode.

179.    That Defendant University Partners has engaged in a pattern of behavior of intimidation, retaliation, harassment to interfere with Plaintiff's housing as stated herein.

180.    Such interference, intimidation, harassment and retaliation arising from post-acquisition of housing has caused Plaintiff suffer tremendous amount of emotional distress, mental anguish and physical injuries in both adhesive capsulitis and malnutrition.

181.    That housing environment was very hostile, physically threatening, degrading, humiliating post-acquisition from September 2017 up until July 31, 2019 as stated herein.

182.    That intimidation, coercion, harassment and interference with housing in retaliation is still ongoing discrimination from post-acquisition September 2017 to dates of this action.

183.    That defendant University Partners influencing hiring of Chris Pokrandt at Plaintiff's new abode, is an ongoing intimidation threatened with removal from housing.

184.    Cardinal Group Investment provided material assistance to University Partners in concert with each other hire Chris Pokrandt intimidate and interfere with Plaintiff housing

185.     Also defendants' acts of failures to remove harassing excessive noise in housing
         or/and delaying such, or as an act of constructive eviction, caused plaintiff hearing loss.

186.     Defendants' owed plaintiff a duty to investigate and remove excessive noise its
         housing that could have caused injury to their tenants, which they failed to do so.

187.     That failures by defendants to remove stomping, jumping and dropping of heavy
         magnitude objects on top of plaintiff's rooftop, proximate cause of Plaintiff's tinnitus.

188.     Plaintiff has a permanent damaged eardrum as a result of dwelling units assigned
         her by defendants with extremely noisy neighbors defendants failed to mitigate or remove.

189.     Plaintiff has a damaged eardrum as a result of dwelling units assigned her or/and
         as a result of defendants' harassment constructive eviction in escalated discrimination,
         intimidation, retaliation or interference with her housing.

190.     Plaintiff has also repeatedly been exposed to higher levels of stress, anxiety, anger,
         fear and shock traumas that have turned into physiological tremors from such stomping,
         jumping and dropping of heavy magnitude objects on her roof-top defendants failed to
         remove

191.     Defendants owed plaintiff a duty of care to have induced stress and anxiety of all
         kinds that it did intentionally or negligently, failures to remove such excessive noises or
         causing them in harassment constructive eviction discrimination.

192.     That even if defendants denies constructive eviction, delays removing such
         excessive noise to provide housing accommodation to noise sensitivity disability, finds it
         still liable.

193.     That such repeat excessive noises exposures, has caused her uncontrollable shaking
         syndrome that has now become a permanent disability in psychological tremors.

194.    Prior Cardinal investment group, LLC, Defendant Peak campus was the landlord and/or owner for landlord at current Plaintiff's new abode "The Rockland West".

195.    Peak Campus Management, LLC, is the one plaintiff signed a lease with having moved out of the University Partners dwelling situation.

196.    M/s. Casey Lay Property manager for "Rockland West" was acting quite a bit strange when Plaintiff just rented from her employer Peak Campus, LLC.

197.    She assigned Plaintiff a unit with similar incidents at the University Partners housing at "The Connection", where occupants would stomp, run, jump and drop heavy magnitude objects on top of her rooftop.

198.    Peak Campus, LLC and employee were the only entity whom knew unit they assigned Plaintiff that she encountered similar excessive noise including the heavy objects.

199.    Plaintiff asserts that Casey Lay and Kasey Miller both of Peak Campus, LLC and University Partners respectively, acted in concert to discriminate plaintiff's disability sensitivity to noise in form of Posttraumatic stress disorder by causing the excessive noise.

200.    That Kasey Miller and Casey Lay both property managers were informed and provided documentation of Plaintiff's sensitivity to noise they failed to accommodate.

201.    Both employees escalated discrimination of plaintiff's disability of excessive noise sensitivity in housing with M/s. Kasey Miller involved with interference with plaintiff's housing in her newer abode where she pursued her to retaliate, intimidate in furtherance discrimination of her prior disabilities request.

202.    Plaintiff suffers posttraumatic stress disorder as a disability that she is extremely sensitive to certain noises and has a record of such disability substantially limiting one or more major activities of daily living that all three defendants were furnished with or aware.

22

203.     Defendant Peak Campus provided material assistance to University Partners by stalking plaintiff with stompers, runners and persons dropping heavy magnitude objects on top of Plaintiff's roof in escalation of University Partners, LLC discrimination of plaintiff.

204.     Peak Campus, LLC also had rented to Plaintiff similar black mold apartment as did University Partners, LLC in concert furtherance discrimination of her rhinitis disability

205.     That Plaintiff has suffered severe personal injury from such black mold exposure by defendant Peak Campus, LLC suffering constant stomach ailments, fevers, headaches, nausea, itching, diarrhea, eye irritation, respiratory distress in wheezing lungs, coughing and lack of appetite amongst others discoverable

206.     Plaintiff was treated for such causes with defendant Casey Lay passively aggressive, partially treating such massive black mold threatened with health department

207.     That Plaintiff had placed similar request with Peak Campus, to accommodate her rhinitis disability mold sensitivity in housing by inspecting unit before renting to her

208.     That it intently refused to accommodate such disability request in its housing exposing Plaintiff to a gross massive black mold its rentals misrepresenting habitability of their property too as "luxury" only shown on some diagram prior leasing

209.     That such wanton intentional acts by "Peak", had Plaintiff also suffer tremendous emotional distress exposed to such mold in intentional infliction of emotional distress

210.     Plaintiff had forego use of kitchen to cook for three months to let the black mold settle out that instead shoot back out four times after a shoddy treatment assigned apartment maintenance employee and not a professional certified mold remover

211.     Massive mold was too difficult to get rid of that to-dates of this action, same mold has resurfaced again six months ago, with staff refusal to co-operate and delaying treatment

212.     That Peak Campus, LLC, wanton, reckless, intentional acts exposing Plaintiff to a massive black mold in housing, proximate cause of Plaintiff's personal injury exposure to mold aggravated rhinitis and other personal injuries described paragraph 206

213.     That Peak Campus, LLC, wanton intentional acts failures to accommodate Plaintiff's rhinitis disability mold sensitivity in housing and make a housing free of all kinds of mold, proximate cause of Plaintiff's personal injury in aggravated rhinitis.

214.     Plaintiff states defendants are a problem to her finding a stable housing without stalking harassment retaliation for prior requests for disability accommodation in housing.

215.     Plaintiff states defendants are a problem to her finding a steady housing without the acts of intimidation and interference for prior requests for disabilities accommodation its housings

216.     That said defendants in several namely Peak Campus Management, LLC; University Partners, LLC and Cardinal Group Investment, Inc. have acted in concert to discriminate plaintiff's disabilities in housing and escalating them.

217.     That the most aggravating factor is that, Plaintiff has been homeless for a steady eight years and it was important that she maintained a steady housing without interference.

218.     That it was important she find a steady housing without intimidation, coercion and retaliations of all kind for seeking housing accommodation with disabilities as stated herein

219.     That Plaintiff has another fair housing violation she has filed a civil action on, and are a similar setting so called "student housing" preferable for tenants with fewer to lesser disabilities encounters.

220.     That these so called "student housing", that majorly involves active lifestyle with no impairments, makes them wantonly discriminate tenants with disabilities intentionally.

221.     This city has high demand for housing because it is a college town and certain

landlords are reckless with its practices of renting that involves discrimination of disabled

222.     That Plaintiff has ran into same lawyers she has sued their landlords in other

actions, representing same landlords she would move into their properties in search of a

steady housing.

223.     That such lawyers and their client landlords have intentionally interfered with

Plaintiff's right to housing without escalated discrimination of all kind.

224.     That in another civil action fair housing violation involving racial discrimination,

are a same setting so called "student housing" who also gives white race tenants

preferences in housing knowingly and intentionally.

225.     Plaintiff asks this court set defendants an example of wanton landlords and/or agent

for owners whom discriminates persons with disabilities its housing.

226.     Plaintiff repeats city of Lawrence being a college town, has high housing demand

and these landlords takes advantage of that to create preferences in housing and intently.

227.     It should be noted that Plaintiff rented from defendant University Partners, LLC

from September 22, 2017 and was ejected by eviction September 09, 2019 when acts of

discrimination incidents she has described herein occurred.

228.     This was a long 24 months enduring discrimination, retaliation, constructive

eviction harassment, coercion, interference and intimidation as described herein.

229.     This was a long 24 months enduring a hostile, degrading, humiliating, physically

threatening environment in its relentlessness

230.    At the Cardinal Group Investment, Inc., she rented property "The Rockland West" addresses 4301 W 24th Place, Unit 712, Lawrence, KS 66047 in September 09, 2019 and still there to this dates of this action but is threatened with eviction too

231.    Her kitchen sink has bad sickening odorous sewer gases backing onto the unit and landlord has refused to fix it now six months in putting in repeat maintenance request

232.    This is a sign that Plaintiff there too faces eviction in a hostile, threatening and intimidating environment for merely seeking disability accommodations narrated herein

233.    Or just another constructive eviction failures to provide for critical maintenances but in retaliations for seeking disabilities accommodations in housing

234.    At this property, she has also endured relentless harassment, hostile environment, and physically threatening, humiliating and degrading environment for now 7 months.

235.    Peak Campus Management, LLC whom was in charge of the "Rockland West" property before "Cardinal" took over, she did with them around 5 months before transition

236.    While "Peak" in charge, she endured relentless discrimination, physically threatening, and humiliating, degrading, hostile and harassing environment by neighbors and staff

237.    Plaintiff need not keep repeating acts she endured that were failures to accommodate disability, retaliation, interference, intimidation and coercion described herein this lengthy action

238.    Plaintiff repeats she suffered tremendous emotional distress that led to counselling and psychiatry intervention of anxiety neurosis, paranoia as to interference with housing

26

239.     Plaintiff repeats suffered aggravated posttraumatic stress disorder and major depression near hospitalization as to worsening condition with suicidal ideations hopelessness in life and finding a stable housing

240.     Plaintiff suffered tremendous emotional distress leading to crisis intervention by local Police Department mental health crisis division team with constant welfare check

241.     Defendant Cardinal Group Investment, Inc. were even informed by Lawrence Police Department about Plaintiff disability to noise needing housing accommodation

242.     Instead defendant used it to humiliate, degrade and ridicule Plaintiff with the harassing neighbor of unit 722 whom painfully insulted her in public attacking her onto her doorway

243.     The neighbor stated things like "Plaintiff is crazy and aged needs to go to a retirement home" and not dwell in student housing, that she's been briefed on my psychosis

244.     Plaintiff asserts a very hostile, degrading, humiliating and physically threatening environment in its relentlessness including up to her unit's doorways and in public

245.     Plaintiff noise sensitivity disability substantially interferers with one or more major life activities of daily living and is posttraumatic stress disorder sensitive to certain noises

246.     Plaintiff has a record of such a disability that were repeatedly furnished to all the defendants this complaint including Peak Campus" and Cardinal Group Investment, Inc.

247.     That they wantonly and intentionally turned down her disabilities accommodation requests, and are all the discrimination asserted herein this action against defendants

248.     Plaintiff repeats suffered tremendous emotional disturbances and distress, intentional infliction of emotional distress and/or negligent infliction of emotional distress caused her by defendants severally

249.     At all times of the discrimination, all defendants were aware by repeat record given
         to them about Plaintiff seeking accommodation in housing with noise sensitivity disability

250.     In repeat occasion Plaintiff asked Peak and Cardinal to ask occupants above her
         unit 722 at the "Rockland West" to remove noises of gross running, stomping, jumping
         and dropping of heavy objects on-top of her roof including wanton skateboarding

251.     Plaintiff was repeatedly treated with contempt with M/s. Valisity Clark, assistant
         property manager even stating things like this is "student housing to expect very loud noisy
         activities", my reasoning is skateboarding, stomping & dropping dumbbells were so noisy

252.     Plaintiff repeats defendants and circles of same lawyers are a problem to her finding
         steady housing as M/s. Valisity Clark even worked for a former boss I sued, in contact with

253.     Her former boss, is also a landlord I have sued in similar situation and went through
         a lot of headache with this worker of constant harassment illegal entry upon unit without
         prior notice and a mysterious missing personal belongings with unit locked back nicely

254.     More critical are my several mysterious disappearances of personal belongings
         from my unit, at the time, I'm the only person dwelling in there, unit locked back nicely

255.     Same incident with University Partners employees, of illegal entry upon property
         and theft of personal belongings with unit doors locked up nicely and no break-ins

256.     These were repeat near everyday incidents of suspected worker loitering units and
         a mysterious disappearances of belonging each time and unit locked back out nicely

257.     Plaintiff repeatedly asked Peak Campus Casey Lay to ask occupant neighbor Unit
         722 keep her noises of running, stomping, jumping and dropping of heavy object down

258.     Plaintiff was treated with contempt and Casey Lay the property manager in charge
         then becoming hostile, intimidating and aggressive each time such request was made

259.     At the time Valisty Clark was her assistant property manager, Lay would then quit and Clark left after Peak Campus transitioned property to Cardinal Investment Group

260.     My disability accommodation in housing of extreme noise sensitivity was turned down with more noise of suspected en-masse gang guests stomping, jumping, running and heavy objects dropped onto my rooftop that is their floor up above me

261.     It should be noted that Plaintiff request for accommodation for noise sensitivity was not that unreasonable but only that she is sensitive to these noises in excessive nature

262.     A noise of skateboarding on top of another's roof and maneuvering tactics like skate jumping might be okay for a normal person, but not someone with a noise sensitivity

263.     Even a normal person would find it disturbing exposed to such constant noise

264.     Plaintiff's design rooftop is made of hardwood that is her neighbor's floor above of her, and she only asked recreational activities loud in nature be taken to the gymnastics

265.     All the three defendants have a gymnastic for its active life tenants and her requests to accommodate her noise sensitivity weren't that unreasonable, for example a dumbbell

266.     Plaintiff made several request with the Cardinal investment Group, Inc. Chief Executive Officer Principal Mr. Alex O'Brien repeatedly leaving voice messages in vain

267.     She even called over the weekends mentioning "distress call, in need of housing accommodation and please return phone calls" when things got out of control with neighbor's noise seeking housing accommodation noise sensitivity in vain

268.     Instead someone called a "Porfolio" from the corporate offices contacted Plaintiff but coercing her to move out that she was the one having problem with the noise

269.     Plaintiff has a prior frozen shoulder from University Partners and other physical disabilities she stated to the so called "Portfolio" in vain but kept coercing her to move out

270.     Neighbor escalated aggression when Plaintiff again resorted to Police intervention, escalating attacks and verbal aggressions on her, physical threatening her on her doorways

271.     These acts of hate in housing including other neighbors also tapping and kicking on her wall at night without any provocation of any kind, were also motivated by race

272.     Plaintiff's other neighbors would intently also knock on her walls from the other side of their unit while attempting to fix meals in her kitchen or from her bedroom walls on their side of the bedroom, or kick on her bedroom walls from outside at night

273.     Plaintiff is a black race female ages 48 years old also of african national origin from Kenya. Plaintiff also a long time homeless advocate, even found lice in her bed twice

274.     Lice infestation caused her personal injury of constant itching, discomfort and severe distress. She does not have direct contact with anyone whom could be infested

275.     Plaintiff believes these are punishment retaliation because she wants to dwell in a "clean environment" as to the mold sensitivity disability accommodation request she made

276.     Lice infestation, is believed used as a form of  punishment retaliation assault correcting her behavior of "demanding to dwell in a so called clean environment"

277.     Her bed would also be used for suspected activities while away including her showers and suspected loitering with door locked back out very nicely and no break-ins

278.     Plaintiff asserts these are constructive eviction harassments by defendants and their staff members, her unit illegally entered into every single day by defendants workers

279.     Even worse, they intently send messages of having illegally been to your unit by intently displacing things how you left them and were repeat incident of harassments

280.     The doors entryways system is a secure electronic system, only apartment complex staff have access to such and is controlled from their offices as to "Peak" and "Cardinal"

281.    Even a break-in would be very difficult because the electronic system would jam very quickly and relock the door back on, this is defendants' employee harassments retaliations and interferences for seeking disability accommodation

282.    Workers plays games of nobody was in your unit, and just call the Police if you suspect a break-in, same University Partners employees would also tell me same thing in their illegal entry upon unit and mysterious disappearances of belongings

283.    Plaintiff currently also endures a suspected carcasses of unknown decomposed matter believed a dead animal sneaked onto her bedroom's rooftop ventilation areas and every-night. The HVAC (heating, ventilation air conditioner ) system is only accessed by apartment complex maintenances staff

284.    This she believes is an escalated constructive eviction harassment for her to move out by staff and believes Cardinal Investment Group, one of the executives are aware of this behavior

285.    Plaintiff is very sore on her adhesive capsulitis and is helpless how she will put belongings together to move out again, but must endure these acts

286.    Plaintiff's lease was scheduled to expire July 31, 2020 and is not known if she is being pushed to leave reasons for the dead carcasses on her bedroom's ventilation system

287.    With her shoulder not getting better, Plaintiff was in the cause of negotiating remaining in unit so that she could heal quicker and her shoulder would not tear moving

288.    Cardinal Investment Group, Inc. Principal, has completely refused to contact me about my housing accommodation grievances  and has left several messages in vain

289.    Plaintiff also asserts that defendants ways of running a multibillion Real Estate Corporations, makes them wanton and intently discriminate protected status in housing

31

290.     Plaintiff at all times of incidents giving rise to this action, was participating in a federally protected activity to housing as a black race person and another national origin

291.     Plaintiff at all times of incidents giving rise to this action, was participating in a federally protected activity to housing as a disabled and physically impaired person

292.     That she believes defendants discriminatory animosity towards her, were motivated by these protected status in housing

293.     Plaintiff repeats while renting at all the three defendants, she was exposed to relentless pattern of harassments that happened everyday while inside and out of housing

294.     Harassment was so pervasive to paralyze several of her major life activities of daily living including not being able to use her kitchen to cook nor enjoy premises

295.     Harassment was so pervasive she spent a lot of time yelling to occupants to stop engaging in boisterous activities was causing her severe mental harm in aggravated PTSD

296.     Harassments of stomping, jumping, running, skateboarding and dropping of heavy magnitude objects were a daily repeat pattern of behavior causing dwelling unbearable

297.     Unbearable to not having a choice but to eject, that Plaintiff asserts defendants engaged intently in her constructive eviction in both interference and retaliations for seeking housing accommodation with physical impairment and disabilities stated herein

298.     Or such constructive eviction harassments, plaintiff's protected status of national origin and un-preferred black race in housing, a motivating factor

299.     Plaintiff repeats black race and of another national origin from Kenya

300.     That other physically threatening environment by M/s. Billie jean Patterson white race neighbor above her unit 722 at "Rockland West" constantly confined her inside unit

32

301.    She would never leave her door open for the fear that she would burgee inside and attack as she even one day blocked me in my doorways demanding why I call police

302.    Or would be worried of a potential assault by a deadly weapon as she has kicked my doors inside in two occasion at 11:20 pm and around 5:30 am

303.    Or would be worried of a potential attack by other neighbors whom also tapped my walls from their other side of the unit while attempting to use kitchen or in my bedroom

304.    Or would be worried of unknown neighbor activities of several knife stab marks on my door Police are not co-operating to investigate because suspected neighbors white race

305.    Plaintiff has not had it easier with Police either whom a lot of them have connived with Billie jean Patterson neighbor in her violent activities telling her take restraining order on me so that I did not call them on her

306.    Plaintiff's has several missing personal belongings too that she has realized an everyday illegal entry on her property's unit believed staff as door not broken into

307.    These was also a pattern of behavior with all the three defendants employees or staff members, again door locked up very nicely and no break-ins

308.    In summary Plaintiff suffered relentless pattern of harassments of gross stomping, running, jumping, skateboarding and dropping of heavy magnitude objects in a daily basis

309.    And that such relentless pattern of harassments, caused her be confined in her unit and bedroom not being able to enjoy premises, prepare even basic meals that she would train herself to fast and only attempt to prepare very basic meals when she was so hungry

310.    It should be noted harassments of stomping and heavy objects, was so pervasive without a choice but to eject is the environment she endured at defendants property housing

311.    Defendant Asset Campus USA, LLC, is also liable to Plaintiff in suit and equity for breach of contract in habitability and fraudulent misrepresentation of its dwellings

312.    Asset Campus USA, LLC misrepresented facts that dwelling addresses 3100 Ousdhal Road, Unit 624, Lawrence, Kansas, Zip Code 66047, was luxuriously ready to go

313.    "Ready" was a misrepresentation to Plaintiff that habitability was a healthy environment to dwell in and that she relied on it to sign a lease contract she could elsewhere

314.    She repeats was shown an indeed very luxurious dwelling model of the unit built inside the leasing office that were not what she was assigned rented a filthy moldy unit

315.    Because of such misrepresentation that Plaintiff relied on, she suffered intentional infliction of emotional distress dealing with a filthy moldy dwelling causing her to perform laborious cleaning and heavily investing in cleaning supplies landlord never refunded

316.    She also suffered physical ailments of aggravated rhinitis exposure to mold, dust mites allergens and other personal injuries as described paragraph 206

317.    Plaintiff repeats must find a steady housing without conspiracy interference with housing in stalking and harassments aggressions by defendants

318.    She needs not endure aggressive defendants whom follow her to dwellings with employees or lawyers to interfere with her housing providing malicious information

319.    Any lingering acts of discrimination on her, must be removed by court and provided her an injunctive relief from civil interference with housing

320.    That she needs a steady housing she can enjoy premises and treated equally as would be preferred protected status tenants in housing including the privileged white race

321.    Plaintiff asserts her protected black race and national origin status, also played a role in disparity treatment and contemptuous handling in housing accommodation request

322.    Plaintiff needs peace of mind to find a steady housing without interference and
        settle down to find and form a family as she keeps moving housing that is disruptive

323.    That Plaintiff was subjected to relentless animosity whereby neighbors would
        stomp, run, skateboard and drop heavy magnitude objects on her rooftop on a daily basis
        since September 2017 to dates that such acts are still in progress in concerted landlords acts

324.    Such hostile environment, made it very difficult for Plaintiff to enjoy her premises,
        leaving 9:00 am and returning home past midnight so as to avoid excessive noise exposure
        with an already sensitive permanent damaged eardrum from past such excessive noises

325.    Plaintiff already with a pre-existing posttraumatic stress disorder noise sensitivity,
        also had to come back home after midnight to avoid further exposure and aggravated ptsd

326.    Occasionally even returning after midnight did not work as soon as she entered her
        apartment, occupant above would be standby ready to stomp and jump on top of her

327.    Plaintiff survival was very difficult only afforded one meal a day outside home as
        to budget as home was very hostile environment to thrive including not being able to cook

328.    Plaintiff with adhesive capsulitis, would have loved to prepare simple easy meals
        for survival e.g. mac & cheese. These excessive noise hostilities happened renting from
        all the four defendants worsening while renting from Cardinal and Peak Campus

329.    Four defendants failed and/or delayed removal of such harassments including the
        excessive noise to accommodate noise sensitivity disability intently and knowingly

330.    Housing accommodation request including seeking landlords remove harassment
        by offending neighbors, were made to principals/owners/staff-charge with authority in vain

331.    Housing accommodation request including seeking landlords remove harassment
        by retaliating staff members, were made to principals/owners/staff supervisor in vain

332.    On one bizarre morning plaintiff woke up to find a massive yellow powder on her
doorway covering her doormats, plaintiff suspected same terrorizing neighbor who did this

333.    An unknown massive powdery substance that police later identified as from a fire
extinguisher outside the unit's hallway. Plaintiff did not have fire but woke up and found
two police officers by her doorway examining the powdery substance called by a neighbor

334.    This known offending stomping activities neighbor upstairs, principal Cardinal
landlord failed to respond to request to discuss her harassments towards plaintiff

335.    She can come and attack me on my doorways calling me names and using painful
degrading and humiliating insults how I'm "a crazy nigga bitch needs move to retirement"

336.    Because these dwellings are referred to by landlord as "student housing", she
insinuates that am an aged nigga who needs to move into retirement home of crazy people

337.    M/s. Billie jean Patterson the intently noisy stomping neighbor, uses such insults
that she's had a discussion with a mental health Police Officer who told her that I am crazy

338.    These open insults while participating in a federally protected activity to housing,
is done degradingly in public by a white privileged female tenant preferred by Cardinal

339.    Billie Jean Patterson the white privileged female tenant preferred in housing by
Cardinal, even blocked my doorway physically threatening why I "keep calling Police"

340.    It was physically threatening to an extent that 911 dispatch whom overheard her
altercation instructed me to stay calm and retreat away from the doorways sending Police

341.    During the Covid-19 stay at home months running from March 2020 through July
2020, Plaintiff endured M/s. Billie Jean Patterson on a daily basis as to her stomping
harassment aggressions, including a daily en-mass gang guests activities dropping heavy
objects on her rooftop, jumping, running, stomping some more and skate boarding

342.    She endured to an extent of coming down hard with major depression when finding a steady housing becomes hopeless and must endure livability suffering severe emotions

343.    Emotional distress was to an extent of nearly being hospitalized by counsellors whom knew about worsening depression caused by the housing instability discrimination

344.    Counsellor even offered suggestion to Plaintiff to try and seek a group of her national origin to blend with so as to help her as her situation was getting really dire

345.    Excessive noise constructive eviction by harassing neighbor was to an extent of Principal landlord being contacted on several weekends with voice messaging left invain

346.    Mr. Alex O'Brien, Chief Executive Officer of Cardinal Group Investment, failed to return Plaintiff's several phone calls even when she used critical terms like "distress call critical housing accommodation request" with harassment by neighbors still ongoing as of action

347.    Plaintiff must also not forget that when she requested for mold and noise sensitivity disability accommodation in housing with Peak Campus prior renting, she suffered retaliation in delayed or refusal critical maintenances request

348.    Property manager M/s. Casey Lay refused Plaintiff's mold sensitivity by denying request to repaint the living room and kitchen walls that were damaged by water and mold

349.    Sort accommodation of such disabilities, escalated to her intentionally holding and delaying critical maintenance request by plaintiff including flood-water from same offending neighbor upstairs (M/s. Billie-Jean Patterson, Unit 722) into her unit's apartment

350.    This Peak Campus also pressured to remove massive black mold she rented to plaintiff with unit that she shoddily had maintenance worker without proper mold certification do, started to retaliate on plaintiff

351.    September 2019 when Plaintiff moved into "Rockland West" under Peak management prior Cardinal acquisition, same problem neighbor flooded her lower unit

352.    Water came spewing from the neighbor' unit atop onto Plaintiff's unit on a large area of the unit's entryways and through the kitchen air ventilation system on the roof into the kitchen sink and its countertops with plasters torn that had prior held torn roof together

353.    Plaintiff would learn this was second time incident happened and plaintiff putting in maintenances request, she was met with rude gruff staff resistance and delays

354.    Escalating matter with Casey Lay, even caused more intentional acts that she had already alerted her employees about me whom were already acting hostile and aggressive

355.    The torn plasters in a form of duct tape, were hanging from the torn area of the roof impacted by the spewing water that I sort drywall to fix and seal off from M/s. lay in vain

356.    These hanging duct tapes kept dripping water on me each time I exited and entered the unit through the hallway that M/s. Lay intentionally delayed maintenance for 3 months

357.    Finally grossly dried up massive mixture of mold and paint chipped off the roof onto food, dishes, stove top, water facet, kitchen sink, its countertops and onto your head while on Unit's entryways that I still kept pleading with M/s. Lay for mold sensitivity disability accommodation to kindly try and find a professional mold remover and drywall

358.    She passively aggressively used her maintenance worker whom scrapped massive moldy paint along with its dust paint all over unit as if in war with unit's kitchen not useable

359.    Gross scrapped moldy paint was all over kitchen, food, dishes, sink, stove, refrigerator, countertops critical cooking and meal preparations areas including the dining room tables and chairs all covered with such moldy paint dust

360.    This took another 1 and a half month with plaintiff not able to utilize her kitchen
again for fear of ingesting unknown lead condition paint mixed with gross black mold
chipped paint dust

361.    Plaintiff at this point worn out stop asking further on drywall as retaliatory behavior
was now physical threatening and hostility she was enduring, she was forced to starve for
her safety

362.    Even more grossing, a junior staffer even stated thought the leakage had been fixed
for good as someone thought leaking was coming from top unit's bathroom's sewer pipe

363.    Plaintiff finds Peak Campus engaging in retaliation delaying and denying critical
maintenance work in housing for plaintiff 's prior seeking both noise and mold sensitivity
disabilities/impairments accommodation in housing

364.    Drywall turned out to be maintenance worker whom again did a very shoddy job
with paint still chipping and falling off the flood damaged roof, that was never remedied

365.    Because of such mold exposure, Plaintiff became very sick and suffered personal
injury; was treated at the emergency room with allergic reaction injection, steroids,
medicine and primary doctor's follow-up

366.    Such mold exposures even absent its sensitivity and hype-reaction, plaintiff's
proximate cause of her personal injuries in lethargy, severe prolonged neurological
headaches, skin rashes, eye irritation, nausea, vomiting, stomach symptoms, constant
fevers and chills

367.    Plaintiff had to avoid certain areas of the unit but her bedroom to limit exposure
that she realized someone had mysteriously shut down all the air ventilation system's in
the entire unit including her bedroom when she was away

368.    It is believed her roommate called for inspection and moved out indefinitely upon learning of mold she was not prior educated on, she left even abandoned certain belongings

369.    Plaintiff also actions for intentional infliction of emotional distress in that all four defendants should have known that their property charge-staff/property managers/general managers involved with the mold incidents, were incompetent employees to successfully manager dwelling units to inspect regularly for habitability and mold

370.    Such intentional acts, was plaintiff's proximate cause in such personal injury exposures to unhealthy dwelling even when she requested housing accommodation prior renting

371.    That Plaintiff upon investigation, even discovered that all the four defendants concealed themselves from being known their whereabouts by tenants including which Principals and where they would be contacted

372.    Plaintiff was taken round when she sort higher supervisors whom she was told were out of town and/or "we can't give you their contact information and are not allowed and must only deal with us about your housing concerns"

373.    Only that Plaintiff's inquisitive and persistent nature made her perform an online search to find these higher persons with authority contact information with calls not returned

374.    This behavior is seen in Cardinal Group Principal not returning phone calls as a matter of courtesy to address these critical situations in housing, asserting intentional acts

375.    Four defendants should have known property managers employees weren't retainable or hiring able but went ahead to hire them to expose tenant's to foreseen dangers

368.    It is believed her roommate called for inspection and moved out indefinitely upon learning of mold she was not prior educated on, she left even abandoned certain belongings

369.    Plaintiff also actions for intentional infliction of emotional distress in that all four defendants should have known that their property charge-staff/property managers/general managers involved with the mold incidents, were incompetent employees to successfully manager dwelling units to inspect regularly for habitability and mold

370.    Such intentional acts, was plaintiff's proximate cause in such personal injury exposures to unhealthy dwelling even when she requested housing accommodation prior renting

371.    That Plaintiff upon investigation, even discovered that all the four defendants intended to fraudulently conceal themselves from being known by tenants including their whereabouts and which Principals would be contacted about matters involving their properties leaving tenants deal with rude-gruff and often times un-co-operating workers

372.    The State of Kansas business registration with Secretary of State requires principal contact information made public for clients to contact them especially for those interstate commerce foreign corporations its territory which four defendants concealed knowingly

373.    Plaintiff was taken round when she sort higher supervisors whom she was told were out of town and/or "we can't give you their contact information and are not allowed and must only deal with us about your housing concerns" by defendants staff members onsite

374.    Plaintiff had to perform a hard search including online on company's website's directory to find names and contact information of higher persons with full corporate authority in order that she could address her housing concerns obviously unwelcome

375.    This behavior is seen in Cardinal Group Principal not returning phone calls as a matter of courtesy to address these critical situations in housing that I assert intentional acts

376.    Four defendants should have known property managers employees weren't retainable or hiring able but went ahead to hire them to expose tenant's to foreseen dangers

377.    Four defendants should have foreseen dangers of tenants being exposed to mold and performed regular mold inspection including known allergens remove them housing

378.    Argued defendants if they had foreseen dangers of pets causing allergies and asked prospective tenants about this, they should have also foreseen other dangers like mold

379.    So when "Cardinal" finally transitioned taking over the Rockland West property, with M/s. Casey Lay quitting work, her assistant manager M/s. Valisty Clark was in charge

380.    Here, things got worse with a staff member still in her position as an assistant manager, not co-operating with request for critical maintainace on a mold that was now aggressively advancing plaintiff had placed such request

381.    It should be noted that this was a problem black mold with capability of shooting back out several times that I learnt property maintenances were only treating it with paint

382.    M/s. Valisity the most rude, gruff and also passively aggressive employee, kept avoiding plaintiff each time she re-visted the mold issue and sort its removal

383.    Or other times when found in the open in the leasing office, she would say, "we will send someone out to take care of problem" and until she too quit work that no one came to resolve the mold issue leaving plaintiff exposed to a fuller dangerous blown mold

384.    As of this action, the black mold came back full blown everywhere in the unit including the living room, kitchen, seats, personal belongings and exposing plaintiff to another round of severe personal injury

385.     When Cardinal demanded a past due rent, plaintiff refused to pay and showed employee the exploded black mold hanging on top of the cooking area where there is stove and microwave

386.     Ontop of the kitchen sink and facet where you fetch cooking and drinking water and everywhere including growing onto plaintiff's belonging, food and dry goods

387.     Newly hired Property Manager, was shocked and staggeringly took photos and on calling on professional mold remover contractor Servpro, unit was condemned advising "Cardinal" remove roof and remodel before any mold treatment work can be done

388.     Also advised them that as mold experts who knows the danger and health complications such mold causes, they are advised against renting premises until treated

389.     Cardinal confirmed the same, and offered to move plaintiff to a different unit stating unit is condemned as unlivable and only after remodeling will mold be taken care of

390.     This again Plaintiff's proximate cause of personal injury in mold exposure that providers have now ruled caused her prolonged repeat constant many symptoms

391.     Such symptoms including Plaintiff being asked to submit to lab works that would rule out HIV/AIDS and Covid-19 ailments as to her wearing heavy winter jackets and layers in warm weathers post winter months

392.     Providers believed the full-blown entire unit mold exposure everywhere, was just being held-in by paint but was already getting into my lungs and body making me very ill

393.     Plaintiff suffered severe respiratory conditions including distressed lungs wheezing and whistling, fevers, body pains, chills and aches, skin condition and irritation, rashes

394.    Also eye irritation, nausea, diarrhea, vomiting, fatigue, neurological headaches, stomach symptoms and other condition discoverable in all the mold exposures incidents dwelling in all four defendants properties

395.    What makes plaintiff's rhinitis sensitivity disability and mold allergies even more critical, is that she must at all times carry with her an epi-pen injector, this was made four defendants known prior renting in seeking housing accommodation

396.    WHEREFORE, Plaintiff prays judgement for monetary damages for several claims against four defendants in an mount exceeding $75,000 including exemplary and cost, including any further relief as may be just and proper, including an injunctive relief from further interference with her housing and removal of all lingering discrimination in her current housing

                    Respectfully Submitted
                    *S/*Quinn Ngiendo
                    Quinn Ngiendo
                    4301 W 24th Place,
                    Unit 712A
                    **Lawrence, KS 66047**
                    Focusidealogist@aol.com
                    Telephone: 785-979-3829