**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **QUINN NGIENDO,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:20-cv-02393-HLT** |
| **ASSET CAMPUS USA, LLC, et al.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiff Quinn Ngiendo is pro se and brings several Fair Housing Act ("FHA") and state law claims stemming from her time in two apartment complexes.[1] Plaintiff's claims center on discrimination based on disability, race, and national origin. The case has progressed through early dispositive motions and discovery. Plaintiff's remaining claims are against three defendants: Asset Campus USA, LLC ("Asset"), Everest Campus West, LLC ("Everest"), and Cardinal Group Management Midwest, LLC ("Cardinal"). She seeks damages against <u>each</u> defendant that exceed $300,000,000.

All three defendants seek summary judgment on the claims against them (Docs. 257, 260, & 263). Plaintiff seeks relief in two motions that relate directly and indirectly to the pending summary judgment motions (Docs. 288 & 290). The Court first addresses Plaintiff's motions. None of her arguments merit further delaying resolution of this case or modifying a prior order. The Court next determines that all three defendants are entitled to summary judgment because they have submitted evidence showing the absence of a genuine issue of fact, and Plaintiff has not met

---

[1]   The Court is mindful of Plaintiff's pro se status and liberally construes her filings. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the Court will not assume the role of advocate. *Id.*

her burden to show that a triable issue of fact remains for a jury to resolve. No reasonable jury could find in Plaintiff's favor on the summary judgment record.

## I.      BACKGROUND

### A.      Predicate Issues Related to Uncontroverted Facts

#### 1.      Motion for Extension of Time (Doc. 288)

All three summary judgment motions are unanswered. Defendants timely filed their separate motions on January 6, 2023, which makes Plaintiff's original response deadline to all three motions January 27, 2023. Plaintiff sought an extension of time to respond on January 24. The Court set briefing deadlines on Plaintiff's motion, but the parties appeared to misconstrue the Court's order as denying Plaintiff additional time. The Court therefore scheduled a February 7 phone conference to resolve the confusion. The Court also struck a brief hurriedly filed by Plaintiff on January 27 that responded to one motion, and temporarily stayed summary judgment briefing. Plaintiff then filed a motion for leave to object to the magistrate judge's ruling on her expert witness disclosures on January 30, one business day late. The same day as the phone conference with the Court, Plaintiff filed another motion for review of a separate order of the magistrate judge. Plaintiff's second motion was also untimely.

The Court explained to Plaintiff during the February 7 conference that it struck her response to Cardinal's summary judgment motion (one of the three pending motions and the only one to which she had responded) because Plaintiff had sought more time to respond, the Court hadn't intended for her to rush to meet the January 27 deadline, and the Court wanted to give her a full opportunity to respond without muddling the record. The Court then asked how much time she needed to respond to the three pending summary judgment motions. Plaintiff requested a February 21 deadline, which the Court granted. This deadline passed. Plaintiff did not file a

response to any of the three motions (or even refile her stricken response). The Court then, *sua sponte*, granted Plaintiff one final opportunity to respond to all three summary judgment motions. Doc. 287. This deadline was March 6, 2023 at 12:00 p.m. The Court advised Plaintiff it would not grant further extensions absent extraordinary circumstances.

March 6 passed without any response or motion by Plaintiff. On March 10, Plaintiff filed an out-of-time motion for extension of time to respond to the summary judgment motions.[2] Doc. 288. Plaintiff explains a series of medical complications she has suffered beginning in 2019. She represents that she recently aggravated a pre-existing condition on February 7-9, and because of the reaggravation received an epidural steroid injection on February 23, 2023. She claims she needs additional recovery time from the injection because she is diabetic.

Plaintiff has not shown extraordinary circumstances or even attempted to address the excusable neglect factors for untimely filing another motion for extension of time. A court may extend the time to file for good cause "on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). To determine whether a party has shown excusable neglect, courts consider: "(1) whether the movant acted in good faith; (2) the reason for the delay, including whether it was within the reasonable control of the movant; (3) danger of prejudice to the nonmoving party; and (4) length of the delay and its potential impact on judicial proceedings." *Layne Christensen Co. v. Purolite Co.*, 2011 WL 124538, at *1 (D. Kan. 2011) (citation omitted).

Plaintiff spends her motion explaining why she could not file her responses to the summary judgment motions by March 6. But she does not address why she could not have filed a motion for

---

[2]   Plaintiff's certificate of service represents that she emailed the motion to the Clerk's Office on March 9, 2023. The date does not make a material difference.

extension of time by that date (and ignores completely that she did not even file a motion for additional time before the February 21 deadline passed). Indeed, between February 21 and March 6, Plaintiff was able to file three documents in another case pending in this district (Case No. 23-4010, Docs. 9, 11, & 13) on February 24 and 27. And on March 15, she was able to file another motion (yet still not her summary judgment responses) in this case. Nevertheless, the Court briefly addresses the excusable neglect factors.

Plaintiff's practice of repeatedly missing deadlines is becoming suggestive of bad faith. The Court is troubled that Plaintiff continues to wait for deadlines to pass before seeking extensions of time. But the Court understands Plaintiff's health conditions likely play some role in her lackadaisical prosecution of this case. The Court therefore will give Plaintiff the benefit of the doubt and find that the first factor weighs in her favor—even if only slightly. The other three factors, however, weigh against her.

Plaintiff's medical conditions have been present throughout this case and have been the basis for multiple extension requests. *See, e.g.*, Docs. 41 at 2 ("But plaintiff is falling behind schedule in a very miserable way as to a public transportation accident she was involved with [on] November 9, 2019 that left her with severe chronic conditions including trauma, debilitating headaches, coccyx injuries, vertigo and dizzy spells that don't go away or respond to [ ] ten months of physical therapy and a neck injury that requires surgery."); 82 (sealed document discussing Plaintiff's injuries and impairments); 172-1 (same); 188-2 (same). The Court is not unsympathetic to Plaintiff's health conditions but is equally mindful that she is choosing to litigate this case (as

well as others) and must comply with deadlines. The Court already advised Plaintiff of this duty yet Plaintiff did not timely seek an extension.[3] The second factor weighs against her.

The third and fourth factors also weigh against Plaintiff. The prejudice to Defendants of once again giving Plaintiff the opportunity to seek additional time to respond to their motions is high. The motions have now been pending for nearly three months and Plaintiff seeks another month to respond. Based on past experience, the Court is dubious Plaintiff would comply with that deadline. Plaintiff has repeatedly treated deadlines as mere suggestions. *See, e.g.*, Docs. 192; 201; 287. Plaintiff's proposed additional delay is unreasonable and would negatively impact the judicial proceedings. It is simply too late, and Plaintiff has proffered no legitimate reason for allowing her to file another motion for extension time, out of time. Plaintiff thus fails to show excusable neglect.

Plaintiff also fails to show good cause even assuming this lower standard applies. Plaintiff once again attaches medical records confirming that she has medical conditions that require care and treatment. But she fails to address why she could not have filed this motion by March 6. The Court gave her a firm deadline to respond to the summary judgment motions. It appears likely that Plaintiff immediately knew she could not meet that deadline and needed to show extraordinary circumstances if she sought further extensions. Plaintiff offers no reason why her medical conditions prevented her from filing this motion for extension of time between March 1, 2023 and March 6, 2023.

The Court denies Plaintiff's untimely motion for extension of time to respond to the three summary judgment motions (Doc. 288). The Court deems the properly supported facts stated in the opening briefs admitted and takes them up without the benefit of Plaintiff's response. This is

---

[3]   More than a year ago, the Court advised Plaintiff that her pro se status did not excuse her from meeting deadlines and warned her it might not be as lenient in the future. Doc. 167 at 3 n.3.

admittedly a harsh result for Plaintiff. But the Court frankly sees no other path to this case's resolution. Plaintiff has been advised multiple times of the potential consequences for failing to timely respond to the summary judgment motions. *See, e.g.*, Docs. 262 (Notice to Pro Se Litigant required by D. Kan. Rule 56.1); 265 (same); 287 at 5 ("If Plaintiff fails to timely respond to a motion, the Court will deem the facts stated in the opening brief admitted and will take up that motion without the benefit of her response."). Once again excusing Plaintiff's failure to comply with deadlines promises to be futile. Defendants have a valid interest in a timely and fair resolution of this case. It is no longer fair to continue giving Plaintiff additional opportunities to prosecute her case.

### 2.    Plaintiff's Motion for Relief (Doc. 290, supplemented by Doc. 292)

The Court denied a request by Plaintiff to review the magistrate judge's order striking all but two of Plaintiff's expert disclosures. Doc. 286. Plaintiff seems to believe the Court ruled that none of the witnesses listed could testify in <u>any</u> capacity. She now asks the Court to allow her to present fact witness testimony of Dan Devin (City of Lawrence Code Enforcement Department) and Cromwell Environmental, Inc.

The relief Plaintiff seeks suggests she misunderstood the impact of the Court's order. The Court overruled Plaintiff's objection to the magistrate judge's order. But the magistrate judge's order only ruled that all but two of Plaintiff's identified "experts" were improperly disclosed as expert witnesses. Judge James did <u>not</u> rule that they were improperly disclosed as fact witnesses (and that issue was not before her). This Court made this distinction clear, noting, "Plaintiff should bear in mind, however, that the mere inability to present the testimony or documents of these witnesses as 'expert testimony' does not automatically foreclose appropriate fact witness testimony or the use of appropriate exhibits assuming the necessary requirements are satisfied."

*Id.* at 3 n.2; *see also id.* at 4 ("Some of the listed businesses and entities may be able to provide fact testimony about what they were asked to do by Plaintiff or Defendants, what they observed, and actions they took.").

Plaintiff is not entitled to relief under Rule 60(d)(1), any other provision of Rule 60, or D. Kan. Rule 7.3. There is no error to correct or any other reason to grant Plaintiff relief from the Court's order. The Court denies Plaintiff's motion (Doc. 290).

### B.    Uncontroverted Facts

Having resolved the predicate issues, the Court now turns to the uncontroverted facts identified in each defendant's motion, which are deemed admitted where properly supported. Many of these facts are taken directly from Plaintiff's deposition testimony. Others, where necessary to flesh out Plaintiff's claims, are taken from the pretrial order and (once) from her second amended complaint. The Court addresses the uncontroverted facts in chronological order based on when each defendant managed an apartment complex where Plaintiff lived—Asset first, then Everest, and Cardinal third.

### 1.    September 2017 through April 23, 2019 (Plaintiff's Time at The Connection while Asset Managed the Property)

Asset managed The Connection, where Plaintiff applied to rent space in a 4-bedroom, 4-bath unit. Prospective tenants of The Connection are shown a model unit that is connected to the clubhouse. Leases are signed for floor plans—not specific units or bedrooms. Prospective tenants complete a roommate assignment questionnaire.

Plaintiff entered a lease at the location on September 5, 2017, and later entered a second lease on August 1, 2018. Plaintiff rented Unit 624, Bedroom D. She did not ask to pre-inspect her unit for mold or suggest she needed to inspect the unit before moving in for health reasons.

Plaintiff completed an Inventory and Connection Form in conjunction with her first lease. In response to complaints on Plaintiff's form, Asset cleaned out the dishwasher, checked out the dryer, replaced drip pans on the stove, and unclogged Plaintiff's bathtub faucet. Asset later gave Plaintiff the option to move to a different bedroom in her same unit to address the noise of an adjacent stairwell. And Asset also responded to a maintenance request from Plaintiff about her refrigerator.

Plaintiff made additional complaints about the condition of her unit. Asset offered Plaintiff several options on October 6, 2017: (1) cancel the lease as of October 31, 2017 and refund her deposit; (2) continue the lease and work with Plaintiff's roommates to resolve issues in the unit; and (3) continue the lease and transfer Plaintiff to another unit with roommate matching and a transfer fee waiver. Plaintiff elected to stay in the same unit and work with her roommates to resolve issues.

Plaintiff complained about excessive mold in her unit. Asset hired Michelle Nelson of Hernly Environmental in response to Plaintiff's complaint. Ms. Nelson conducted a mold screening of Plaintiff's unit on August 28, 2018. Ms. Nelson found no elevated mold levels and recommended no further action. Asset is not aware of there ever being excessive mold levels in Plaintiff's unit or bedroom. Plaintiff never requested an accommodation from Asset and has no documentation that she advised Asset that she has rhinitis or mold allergies.

Plaintiff is a black immigrant from Kenya. Plaintiff assumed that other tenants living at The Connection were not immigrants because they spoke English and were Caucasian. But Plaintiff has no personal understanding about the racial or ethnic diversity of other tenants living at The Connection. She never entered another person's unit while she lived there, but she believes white residents had nice apartments because they were white.

## 2. August 16, 2019 through January 13, 2020 (Plaintiff's Early Time at Rockland West while Everest Managed the Property)

Plaintiff signed a lease on August 16, 2019 to live at Rockland West from September 1, 2019 through July 31, 2020. Everest managed the property at the time. Plaintiff moved in and shortly thereafter told employees her unit was unclean and mold was present, and she asked for the unit to be cleaned. Plaintiff followed up by email with the Rockland West leasing manager on September 5. The manager responded the same day. Employees cleaned Plaintiff's unit on September 9.

Plaintiff completed a move-in form on September 9 indicating there was mold in her apartment. She submitted a Reasonable Accommodation Verification Form for allergy and breathing sensitivity on September 13. Property manager Cayce Lay asked that the form be completed by a licensed medical professional. Plaintiff did not return a form completed by a licensed medical professional.

Plaintiff sent Ms. Lay a letter on September 23 complaining that the mold was not properly mitigated by a mold professional. Plaintiff asked for additional items to be performed in her unit on October 4, and the Rockland West leasing manager said she put in a service request for Plaintiff on the same day. Plaintiff emailed Ms. Lay again on October 8, stating she was still getting sick from the mold exposure. Ms. Lay again requested that Plaintiff have her treating physician complete the reasonable accommodation form on October 9. There is no evidence that Plaintiff returned a form completed by her treating physician.

Plaintiff claims Everest retaliated against her by failing to properly mitigate the mold and requiring her to live with mold. Everest stopped managing Rockland West on January 13, 2020.

3.   **August 2020 through August 2021 (Plaintiff's Later Time at Rockland West while Cardinal Managed the Property)**

Cardinal took over management of Rockland West on January 13, 2020. Plaintiff entered into a lease with Cardinal on August 12, 2020, to last from August 1, 2020 through July 31, 2021.

Rockland West's Community Manager emailed Plaintiff on August 3, 2020 to follow up on a conversation about issues with Plaintiff's unit, mentioning she was "unaware of the issue prior to my visit and I want to address it immediately." Kayla Humston, Cardinal's property manager, emailed Plaintiff the following on August 9, 2020:

> Below is a recap of what we discussed in the office on Friday, 8/7/2020.
>
> Due to the situation in your current apartment, you will need to transfer apartments as soon as soon as possible and sign a lease to live at Rockland West from now until July 31, 2021.
>
> Per your request, Wednesday, 8/12/2020 is the soonest you can move. The apartment we have in mind is 1014.
>
> Rockland West will pay to hire a professional moving company to pack your personal items in boxes and move them to your new apartment.
>
> You asked to see the apartment that you will be transferring to. We scheduled this for Tuesday, 8/11/2020 at 5PM.
>
> You requested the following accommodations:
> - Ground floor – Approved.
> - New mattress – Approved.
> - New couch – Approved.
> - New paint (rather than touch-up only) in the common areas and assigned bedroom – Approved.
> - Quiet apartment – We will do what we can, but this is not guaranteed. As of now, you will be the only person occupying the apartment but this is subject to change. Also, I cannot guarantee that you do not get roommates or that your neighbors are quiet.
>
> . . . .

[A]s of now, your move is scheduled for Thursday, 8/13/2020.

Doc. 264-4 at 1-2.

Plaintiff moved from Unit 712 to Unit 1014, and her initial reaction was that it was clean and she could not see mold. Plaintiff requested additional cleaning shortly after the move, and Ms. Humston confirmed a cleaner would be in Plaintiff's apartment on August 17, 2020.

Plaintiff emailed Ms. Humston a noise complaint on August 14, 2020. Ms. Humston responded that she would send an email about the noise to the residents in the unit above Plaintiff. Plaintiff emailed Ms. Humston again three days later to complain about the noise and offered to relocate again at Rockland West's expense. She specified that "[t]his is [a] noise sensitivity disability housing accommodation request." Doc. 264-7 at 1. Plaintiff emailed Ms. Humston about excessive noise from her neighbors again on August 25, 2020.

Plaintiff never saw anyone creating the noise. She referred to the source as a "ghost neighbor" during her deposition. She also acknowledged during her deposition that she had no evidence of the excessive noise coming from anywhere outside her apartment. She represented that she called the police several times, but the police told her to address the issue with management. She said they also told her to record the noise. But Plaintiff didn't record the noise, as she didn't have a good way of doing it and had difficulties with background noise.

Plaintiff believes that Cardinal employees were involved in creating the excessive noise. She believes that about 70% of Cardinal and Everest employees were involved in the noise. Plaintiff bases this belief on management's failure to stop the noise of another tenant in Plaintiff's first apartment. She believes Cardinal retaliated against her for reporting anything relating to her PTSD or noise sensitivity "[b]ecause the noise became more excessive and out of control and got to a point where I had to call the police every day." Doc. 264-3 at 164. But Plaintiff also said in

her deposition that she told Ms. Humston she was sensitive to noise and did not need to mention

PTSD. *Id.* at 159-160. Plaintiff explained in her deposition:

> Well, first of all, the neighbors and employee excessive noise, stomping was constructive eviction and, like, it's all in the second amendment. Landlord figured out I was not the right person for their property and so they started having employees to the best of my knowledge who were stomping and dropping things atop and I was dwelling underneath. So it was constantly excessive noise to eject me out of housing. And I didn't want that. And pretty much conspiracy with the neighbor. And the landlord mastermind here in having even the neighbor do the things that they were doing. So noise, excessively boisterously loud noise repeatedly. And so it wasn't a quiet, tranquil environment as I thought.

*Id.* at 50.

Plaintiff was asked during her deposition what evidence she has that Cardinal prefers white

residents. She responded that based on her personal observation, "so many tenants they have white

race." *Id.* at 163-64. Plaintiff also testified in response to the following questions:

> Q. Do you have any evidence to support your allegation that you were discriminated against based on your race or national origin?
>
> A. Because of the things that happened, I don't believe there was any white person who was complaining of harassment, illegal entry in to property by landlord. That was directed towards me because of my race and national origin.
>
> Q. Right. And I understand you say I believe that it's because of and the testimony that you provided. What I'm asking for is: Do you have anything outside of just your belief or perception? Do you have any type of documents or evidence to support your statement?
>
> A. Discrimination as to race, nation origin, it's not obvious, Mr. Edwards. And I keep answering that question.

*Id.* at 179-80.

Cardinal never denied Plaintiff access to areas within the Rockland West community.

Plaintiff failed to pay her rent, and on August 25, 2021, the Douglas County District Court granted

Cardinal's petition for eviction and entered judgment against Plaintiff for $7,015 for rent, costs, and interest.

## II.      STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

## III.      ANALYSIS

Plaintiff brings similar or identical claims against all three defendants: (1) failure to accommodate under the FHA for Plaintiff's rhinitis (Asset and Everest) and PTSD (Cardinal); (2) retaliation under the FHA (all three defendants); (3) disparate treatment under the FHA (Asset and Cardinal); (4) intentional infliction of emotional distress (all three defendants); (5) negligent infliction of emotional distress (Asset); (6) failure to train, supervise and hire (all three defendants); and (7) breach of contract (implied warranty of habitability) (all three defendants). No reasonable jury could find for Plaintiff on this record, so the Court grants all three motions.

### A.      Failure to Accommodate under the FHA

The FHA makes it unlawful for housing providers to discriminate against any person in the terms, conditions, or privileges of rental of a dwelling because of a handicap of that person. 42

U.S.C. § 3604(f)(2). Prohibited discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). A plaintiff establishes a claim for failure to accommodate a disability under the FHA if she shows the following elements: (1) the plaintiff is handicapped as defined by the FHA, (2) the defendant "knew or reasonably should have known of the claimed handicap," (3) an accommodation of the handicap may be necessary "to afford the handicapped person an equal opportunity to use and enjoy the dwelling," (4) the accommodation is reasonable, and (5) the defendant refused to make the accommodation. *Arnal v. Aspen View Condo. Ass'n, Inc.*, 226 F. Supp. 3d 1177, 1183 (D. Colo. 2016) (citing *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006)).

### 1.    Rhinitis (Asset and Everest)

Plaintiff claims that both Asset and Everest failed to accommodate her rhinitis under the FHA. The problems with Plaintiff's claims are many. <u>First</u>, there is no evidence that Plaintiff's rhinitis constituted a disability under the FHA. <u>Second</u>, there is no evidence that Asset knew or reasonably should have known Plaintiff had a disability. <u>Third</u>, there is no evidence that Plaintiff requested an accommodation from Asset. <u>Fourth</u>, there is no evidence that Everest (or Asset) refused a reasonable accommodation. Any one of these missing elements is fatal to Plaintiff's claims. The Court briefly discusses each of them.

<u>First</u>, there is no evidence that Plaintiff's rhinitis constituted a disability. Plaintiff claims mold triggers her rhinitis and causes breathing problems. But breathing difficulties such as asthma do not automatically constitute a disability. *Gorbea v. Verizon N.Y., Inc.*, 2014 WL 917198, at *8 (E.D.N.Y. 2014) (citing *Burke v. Niagra Mohawk Power Corp.*, 142 F. App'x 527, 529 (2d Cir.

2005) ("noting that 'asthma does not invariably impair a major life activity' and finding in part due to the fact that plaintiff's asthma attacks were infrequent that she was not disabled under the ADA"); *Hendler v. Intelecom USA, Inc.*, 963 F. Supp. 200, 207 (E.D.N.Y. 1997) ("Because one plaintiff with asthma is substantially limited in the major life activity of breathing does not mean that every plaintiff with asthma has a qualifying disability under the ADA.")). A disability under the FHA is defined as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h). Everest requested that Plaintiff have a medical professional complete a Reasonable Accommodation Verification form. If Plaintiff had complied, perhaps it would have shown she had a qualifying impairment. But Plaintiff didn't. And Plaintiff has proffered no other evidence from which this Court could determine that her rhinitis constituted a disability. Plaintiff fails to meet the first element.

Second, there is no evidence that Asset knew or reasonably should have known Plaintiff had a disability. There is simply no evidence in the summary judgment record that Plaintiff ever told Asset she had a disability or gave Asset information suggesting she had one. Plaintiff never asked Asset to inspect her unit for mold before moving in. She did complete a form complaining about the dishwasher, stove drip pans, the dryer, and the tub faucet. She also complained about noise. And Plaintiff eventually complained of mold in her unit. In response, Asset hired Michelle Nelson of Hernly Environmental, Inc. to conduct a mold screening. Ms. Nelson found no elevated mold levels and suggested no further action.

Third, the same evidence above indicates Plaintiff never requested an accommodation from Asset. Fourth, neither Asset nor Everest refused a reasonable accommodation. Plaintiff did ask Everest's assistant property manager to accommodate her rhinitis by removing mold and cleaning

her unit. Rockland West cleaned Plaintiff's unit in response to Plaintiff's request. Plaintiff believes Rockland West should have hired a professional cleaning company instead of using its own maintenance employees. But Plaintiff has not shown that mold remained in her unit after the cleaning or that a professional cleaner would have done more than Rockland West's employees. "[T]he duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person . . . wants such an accommodation made." *Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003) (citation and internal quotation marks omitted). A plaintiff's subjective unsupported belief is insufficient to prevail on a motion for summary judgment. *See Argo v. Blue Cross Blue Shield of Kan., Inc.*, 2005 WL 466323, at *8 (D. Kan. 2005). Plaintiff fails to show that Everest's response to her request (cleaning her unit) was a denial of a reasonable accommodation.

Asset and Everest have met their initial burden to show the absence of a genuine issue of fact precluding summary judgment. Plaintiff has failed to present any evidence to support her failure to accommodate claims against Asset and Everest. The Court grants summary judgment on these claims.

### 2.     PTSD (Cardinal)

Plaintiff's claim against Cardinal for failure to accommodate is slightly different but suffers from some of the same maladies. Plaintiff claims to also have a disability of PTSD that makes her noise-sensitive. She alleges that Cardinal failed to remedy incidents of excessive noise and harassment and that its employees participated in it. But she fails to show that her requested accommodation was necessary, reasonable, or refused by Cardinal.

Plaintiff represents that she called the police several times but they did not act on her complaints. They told her to record the noises, but she did not. Plaintiff also has not shown that

anyone else but her complained of excessive noise. Plaintiff could not identify who was making the noise and referred to the neighbor as a "ghost neighbor." Yet she claims 70% of Rockland West employees participated in a conspiracy with residents to make the noise excessive without evidence to support that allegation. Nevertheless, Cardinal attempted accommodation by emailing tenants to be cognizant of their noise level.

"[W]hile the FHA requires accommodations necessary to ensure the disabled receive the same housing opportunities as everybody else, it does not require more or better opportunities." *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 923 (10th Cir. 2012). An accommodation is necessary when the request is "indispensable," "essential," or something that "cannot be done without." *Id.*

Cardinal never denied Plaintiff access to any areas at the apartment complex because of her PTSD. And Plaintiff fails to show her request for an accommodation to "remedy the excessive noise" is a necessary accommodation. Plaintiff has not shown it is indispensable, essential, or something that could not "be done without" for Plaintiff to enjoy the same housing opportunities as other tenants. Plaintiff continued to reside at Rockland West, despite her noise complaints. She provides no evidence that the excessive noise existed.

Cardinal has met its initial burden to show the absence of a genuine issue of fact precluding summary judgment on this claim. Plaintiff has failed to demonstrate that genuine issues remain for trial. Simply stated, no reasonable jury could find for Plaintiff on this claim. Cardinal is entitled to summary judgment on this claim.

### B.     Retaliation Under the FHA

Plaintiff alleges that Asset, Everest, and Cardinal retaliated against her for seeking an accommodation under the FHA. Under the FHA, "[i]t shall be unlawful to coerce, intimidate,

threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. Plaintiff thus establishes an FHA retaliation claim by showing that "(1) she is a protected individual under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) the defendants coerced, threatened, intimidated, or interfered with the plaintiff on account of her protected activity under the FHA, and (4) the defendants were motivated by an intent to discriminate." *Hatfield v. Cottages on 78th Cmty. Ass'n*, 2022 WL 2452379, at *8 (10th Cir. 2022) (internal quotation marks and citation omitted).

As noted above, Plaintiff fails to show that she requested an accommodation from Asset, which equates to lack of a protected activity. And for Asset and Everest, Plaintiff fails to provide any evidence of coercion, threats, intimidation, or interference. The summary judgment record indicates that Asset was responsive to Plaintiff's complaints and gave her several options to address her living situation. The summary judgment record is devoid of any evidence of coercion, threats, intimidation, or interference by Asset. Plaintiff claims that Everest retaliated by insufficiently cleaning her apartment, leaving her to live with mold. But Plaintiff has nothing but her own unsupported allegations that Everest insufficiently mitigated any mold. And Plaintiff failed to ever provide Everest with medical documentation to support her claim that additional cleaning was necessary. There is no evidence of coercion, threats, intimidation, or interference by Everest.

Cardinal at least arguably subjected Plaintiff to interference on some level; eventually, Cardinal evicted Plaintiff for failure to pay.[4] But Plaintiff has provided no connection between her

---

[4]   Plaintiff also claims that Cardinal retaliated against her by participating in the excessive noise. There is no evidence supporting Plaintiff's allegations of excessive noise—let alone that Cardinal participated in it. Plaintiff's unsupported allegations and beliefs are insufficient to create a triable issue for the jury.

protected activity and her eviction. The summary judgment record shows that Cardinal moved Plaintiff upon her first complaint. Cardinal was responsive to other complaints, emailing tenants to be mindful of their noise levels. There is simply no connective evidence linking Plaintiff's complaints to her eventual eviction for non-payment or suggesting that Cardinal acted out of an intent to discriminate.

Defendants have met their initial burden to show the absence of a genuine issue of fact precluding summary judgment on these claims. Plaintiff has failed to demonstrate that genuine issues remain for trial. The Court grants summary judgment to all three defendants on the retaliation claims.

### C.      Disparate Treatment Under the FHA

Plaintiff brings claims for disparate treatment under the FHA against Asset and Cardinal. To establish a claim for disparate treatment based on race or national origin under the FHA, Plaintiff must show the following:

> she is a member of a protected class; (2) she was denied a rental relationship or otherwise treated differently in the terms, conditions, or privileges of her rental relationship or in the provision of services or facilities to her as a tenant; and (3) the different treatment was, at least in part, because of her [protected class].

*Wilson v. Guardian Mgmt., LLC*, 383 F. Supp. 3d 1105, 1108 (D. Or. 2019) (citing 42 U.S.C. § 3604(b)). "The ultimate question in a disparate treatment case is whether the defendant intentionally discriminated against [the] plaintiff." *Honce v. Vigil*, 1 F.3d 1085, 1088 (10th Cir. 1993). The analysis involves examining different treatment of similarly situated people. *Bangerter v. Orem City Corp.*, 36 F.3d 1491, 1501 (10th Cir. 1995).

Plaintiff is a member of a protected class: she is a black immigrant. But she has brought forth absolutely no evidence that Asset or Cardinal treated her differently because of her protected class.

Asset sets forth evidence that it showed Plaintiff a model unit before move-in according to policy. Asset also followed policy when assigning Plaintiff a unit. Plaintiff brings forth nothing but unsupported and speculative allegations that she was treated differently in the terms and conditions of her initial visit or room assignment because of her race or national origin. Plaintiff also fails to show Asset treated her differently than non-minority tenants. She offers only speculative testimony that Asset assigned non-minority tenants nice units; she bases this allegation on peeking through the patio window of another unit. But "statements of mere belief" are insufficient to create a genuine issue of material fact. *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994); *Marbly v. Home Props. of N.Y.*, 205 F. Supp. 2d 736, 744 (E.D. Mi. 2002) (granting summary judgment because the plaintiff failed to "come forward with evidence that non-minority tenants . . . received timelier responses to their maintenance or repair requests.").

As for Cardinal, Plaintiff alleges that "such a constructive eviction in housing, were retaliation for plaintiff exercising a right under the fair housing civil rights law to seek a fair housing as a black race and another national origin person." Doc. 85 at 25. Plaintiff stated during her deposition that she believed Cardinal preferred white residents "[b]ecause so many tenants they have white race." Doc. 264-3 at 163. These allegations are similarly insufficient to create a genuine issue of material fact as to whether Cardinal treated Plaintiff differently because of her race or origin.

Asset and Cardinal have met their initial burden to show the absence of a genuine issue of fact precluding summary judgment. Plaintiff has failed to present any evidence to support her

disparate treatment claims against Asset and Cardinal. The Court grants summary judgment on these claims.

### D.      Intentional Infliction of Emotional Distress

Plaintiff claims all three defendants subjected her to intentional infliction of emotional distress. Plaintiff must show intentional infliction of emotional distress using the following elements: (1) the defendant acted intentionally, or in reckless disregard of the plaintiff; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe. Pattern Inst. Kan. Civ. § 127.70 (Kan. Jud. Council 2021). Conduct must be "so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Taiwo v. Vu*, 822 P.2d 1024, 1029 (Kan. 1991) (citation omitted).

The summary judgment record is devoid of evidence that any of the three defendants engaged in extreme and outrageous conduct. The uncontroverted facts show that Asset responded swiftly to Plaintiff's complaints. Asset's maintenance staff quickly fixed the problems identified in Plaintiff's Inventory and Assessment form. Asset offered to move Plaintiff without charge or terminate her lease without penalty. Asset retained a certified mold remediation inspector to inspect Plaintiff's apartment, and it offered to let Plaintiff move bedrooms in her unit when Plaintiff complained about noise.

Everest's actions were similarly benign. Everest responded to Plaintiff's complaints about mold when Plaintiff raised them. Everest cleaned the apartment for Plaintiff. When Plaintiff continued to complain, Everest simply asked for a medical professional to complete her

accommodation form. Significantly, Plaintiff continued to live at Rockland West after Everest cleaned her unit.

Plaintiff's allegations against Cardinal fare no better. Plaintiff complained about mold in her unit and Cardinal transferred her to another unit. Plaintiff is upset that Cardinal did not take more action on her noise complaints. And she accuses Cardinal employees of engaging in the noise-making, although she never saw any person "in action." But Plaintiff's unsupported allegations are insufficient to create a genuine issue of material fact over whether Cardinal's actions were outrageous and extreme.

Defendants have met their initial burden to show the absence of a genuine issue of fact precluding summary judgment on these claims. Plaintiff has failed to demonstrate that genuine issues remain for trial. The Court grants summary judgment to all three defendants on Plaintiff's state law claims for intentional infliction of emotional distress.

### E.      Negligent Infliction of Emotional Distress

Plaintiff brings her negligent infliction of emotional distress against Asset only. To prove a claim for negligent infliction of emotional distress, Plaintiff must show that (1) she suffered physical injury, (2) as a direct result from the emotional distress caused by the defendant's negligence, and (3) the injury appeared within a short span of time after the emotional disturbance. *Majors v. Hillebrand*, 349 P.3d 1283, 1285 (Kan. Ct. App. 2015) (citations omitted). A key element of a negligent infliction of emotional distress claim is that of <u>physical injury</u>. *See McLinn v. Thomas Cnty. Sheriff's Dep't*, 535 F. Supp. 3d 1087, 1111 (D. Kan. 2021) ("Kansas also permits recovery for the negligent infliction of emotional distress, but courts have 'long held that a plaintiff cannot recover for emotional distress caused by the defendant's negligence unless that emotional distress is accompanied by or results in physical injury to the plaintiff." (internal citations

omitted)). "The qualifying physical injury 'must directly result from the emotional distress allegedly caused by the defendant's negligence and must appear within a short span of time after the emotional disturbance.'" *Id*. (internal citation omitted). "Generalized physical symptoms of emotional distress such as headaches and insomnia are insufficient to state a cause of action." *Ely v. Hitchcock*, 58 P.3d 116, 125 (Kan. Ct. App. 2002) (internal citation omitted).

The summary judgment record contains no evidence of any physical injury stemming from Asset's conduct. Plaintiff's failure to submit any evidence of physical injury to support her negligent infliction of emotional distress claims is fatal to her claim. Asset has shown there is no issue of fact for trial, and the Court grants summary judgment to Asset on this claim.

### F.      Failure to Train, Supervise, and Hire

Plaintiff brings state law claims for failure to train, supervise, and hire against all three defendants. Employers have a duty to "hire and retain only safe and competent employees." *Plains Res., Inc. v. Gable*, 682 P.2d 653, 662 (Kan. 1984). An employer breaches this duty when it has reason to believe hiring the employee poses undue risk of harm to others and yet hires the employee anyway. *See Schmidt v. HTG, Inc.*, 961 P.2d 677, 695 (Kan. 1998). Negligent supervision occurs when an employer has reason to believe an employee poses an undue risk of harm to others yet fails to supervise the employee. *Wayman v. Accor N. Am. Inc.*, 251 P.3d 640, 650 (Kan. Ct. App. 2011). And an employer engages in negligent training when an employee causes injury that would have been prevented by better training. *Estate of Belden v. Brown Cnty.*, 261 P.3d 943, 968 (Kan. Ct. App. 2011).

Plaintiff fails to identify any employee that she claims Asset, Everest, or Cardinal should not have hired because he or she poses an undue risk of harm to others.[5] Neither does she proffer any evidence that Asset, Everest, or Cardinal failed to supervise or inadequately supervised any employee who posed an undue risk of harm to others. And finally, Plaintiff fails to identify any inadequate training by any of the defendants that resulted in injury to Plaintiff. Plaintiff has not offered any evidence to support her claims for negligent hiring, training, or supervision.

Defendants have met their initial burden to show the absence of a genuine issue of fact precluding summary judgment on these claims. Plaintiff has failed to demonstrate that genuine issues remain for trial. The Court grants summary judgment to all three defendants on these state law claims.

### G.    Breach of Contact (Implied Warranty of Habitability)

Plaintiff claims all three defendants breached the implied warranty of habitability. To show a breach of the implied warranty of habitability, a tenant must show "the development of a dangerous or unsanitary condition of the premises materially affecting the life, health, and safety of the tenant." *Malm v. Shepard*, 2001 WL 37131758, at *3 (Kan. Ct. App. 2001). Kansas courts consider the following factors in determining whether a condition or defect is actionable: "(1) whether the condition violates a housing law, regulation or ordinance; (2) the nature and seriousness of the defect; (3) the effect of the defect on safety and sanitation; (4) the length of time the condition has persisted; and (5) the age of the structure." *Id.* (citation omitted).

---

[5]   In her stricken response and affidavit to Cardinal's summary judgment motion, Plaintiff does "name names" of Cardinal employees who she alleges engaged in bad behavior. *See generally* Docs. 269, 270. But the Court struck Plaintiff's response to give her the opportunity to take additional time to update and improve it. Plaintiff never refiled the response in any form—despite being given two opportunities to do so. This potential evidence therefore is not properly before the Court.

There is no evidence in the summary judgment record supporting Plaintiff's allegation that her apartment units contained excessive mold or that any purported defect was a violation of a housing law, regulation, or ordinance.[6] The Hernly Environmental report concluded no elevated mold levels were present in The Connections unit managed by Asset. And Plaintiff entered a second lease for the same unit in The Connections, which belies any suggestion that mold prevented her from using the premises. Plaintiff complained to Everest of mold at Rockland West, and Everest had the unit cleaned for her. Plaintiff then resided in that unit for the duration of her lease term with Everest. And when Plaintiff complained to Cardinal of issues at Rockland West, Cardinal promptly moved her to a different unit. Plaintiff fails to present any evidence that conditions in either apartment complex materially affected the life, health, and safety of Plaintiff as the tenant.

Defendants have met their initial burden to show the absence of a genuine issue of fact precluding summary judgment on these claims. Plaintiff has failed to demonstrate that genuine issues remain for trial. The Court grants summary judgment to all three defendants on Plaintiff's breach of contract claims.

## IV.      CONCLUSION

Plaintiff has failed to meaningfully participate in this case since Asset, Everest, and Cardinal filed their motions for summary judgment. Instead of responding to the motions, she has repeatedly sought to delay and avoid responding. The Court sympathizes with Plaintiff's assorted medical issues. But this is her case to prosecute. She has failed to do so despite being given multiple opportunities and warnings. One simple option would have been to timely refile the response to

---

[6] Plaintiff's stricken response to Cardinal's motion for summary judgment includes an attachment suggesting there may have been a code violation in August 2021, while Cardinal managed the property and just before Plaintiff was evicted. *See* Doc. 269-1. But again, the Court struck Plaintiff's response and Plaintiff never refiled it in any form despite being granted additional time to do so. This potential evidence therefore is not properly before the Court.

Cardinal's motion that the Court struck to give Plaintiff additional time to draft. Docs. 269, 270. Even if the Court were to consider this stricken response, however, it would not change the outcome of Cardinal's motion (or Asset's or Everest's). Plaintiff fails to controvert Cardinal's facts as required by D. Kan. Rule 56.1. She repeatedly refers to her obligation as one to "plead on information and belief." *See, e.g.*, Doc. 269 at 3; 5; 7; 9; 13. But this case is no longer at the pleading stage. The parties completed discovery and Plaintiff must come forth with <u>evidence</u> to support her claims. *See Tavery*, 32 F.3d at 1426 n.4 ("[S]tatements of mere belief must be disregarded" in deciding summary judgment.). That she has failed to do.

The Court has considered the full summary judgment record and the governing law in reviewing the motions. The Court is mindful of its duty to consider the merits of the summary judgment motions, not merely granting them as uncontested under D. Kan. Rile 7.1 *See Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002). All three defendants have shown the absence of a fact issue precluding summary judgment and Plaintiff has failed to show any issue of fact remains for trial. No reasonable jury could return a verdict for Plaintiff based on the summary judgment record.

The Court also denies Plaintiff relief on her two pending motions because she fails to meet the governing standards for relief.

THE COURT THEREFORE ORDERS that Plaintiff's motion for extension of time (Doc. 288) and motion for relief (Doc. 290) are denied.

IT IS FURTHERED ORDERED that Asset's motion for summary judgment (Doc. 257), Everest's motion for summary judgment (Doc. 260), and Cardinal's motion for summary judgment (Doc. 263) are granted. The case is closed. Under Fed. R. App. P. 4(a), Plaintiff has 30 days from the date of judgment to appeal.

IT IS SO ORDERED.

Dated: April 4, 2023                                    /s/ *Holly L. Teeter*
                                                       HOLLY L. TEETER
                                                       UNITED STATES DISTRICT JUDGE